# Richmond

CITY OF RICHMOND V. COUNTY OF HENRICO, ET ALS.

April 22, 1946.

Record No. 3014.

Present, All the Justices.

The opinion states the case.

*Horace H. Edwards, J. E. Drinard* and *Olin A. Rogers,* for the appellant.

*McGuire, Eggleston, Bocock & Woods* and *Denny, Valentine & Davenport,* for the appellees.

Browning, J., delivered the opinion of the court.

The issues involved in this case grow out of the annexation by the city of Richmond of a large territory, of which Windsor Farms and Grove Avenue Crest are a part. For former opinion, see 177 Va. 754, 15 S. E. (2d) 309. These are subdivisions which were developed by Windsor Farms, Inc. and Grove Improvement Corporation, respectively. At the time they were developed, they were within five miles of the city of Richmond, a city of more than 150,000 inhabitants, and therefore they were within the provisions of sections 5222g-5222o of the Code of Virginia of 1942, Acts of 1924, p. 713.

The controversy involved arises under the provisions of section 5222k of the said Code. We quote the pertinent parts of this section:

"In the event the proprietors or owners of any such subdivisions desire to construct in, on or under any streets or alleys located in that portion of such subdivision which lies beyond the corporate limits of any such city, any gas, water, sewer or electric light or power works, pipes, wires, fixtures or systems, they may present plans or specifications therefor to the chief engineering officer of any such city adjoining or within five miles thereof who shall within one hundred and eighty (180) days thereafter approve or disapprove the same, and in the event of his failure either to approve or disapprove any such plans or specifications within such period, such plans and specifications may be submitted after ten days' notice to such city, to the judge of the Circuit Court of the county wherein the land embraced within said subdivision, or any part thereof lies, for his approval or disapproval, and his approval thereof shall, for all purposes of this act be treated and considered as the approval of said engineering officer, and from the decision of such judge in approving or disapproving such plans or specifications there shall be no appeal; provided, however, that nothing herein contained shall be construed as granting the right of appeal from the action of said chief engineering officer in approv-

ing or disapproving such plans and specifications, and provided further, that in the event the improvements contemplated by such plans and specifications are constructed under plans and specifications which have not been approved in one of the methods hereinbefore prescribed, such owner or proprietor shall have the right to remove them upon annexation by the city of the territory in which they may be laid, and the said city shall at no time thereafter make use of them for public purposes without paying the owner thereof just compensation therefor.

"In the event the whole or any part of any such subdivision, which is located in any county and is made and platted pursuant to this act, shall thereafter be made, by annexation proceedings, or otherwise, a part of any city, then so much of such works, pipes, wires and systems as shall have been laid and constructed in accordance with plans and specifications approved either by the chief engineering chief of such city, or by the judge of said circuit court in the manner aforesaid, and as shall be works of public improvement or utility of that nature which such city has theretofore owned or operated within its limits and as shall be located in, upon or under any street or alley to be made a part of such city by such annexation or other proceeding, shall be and become the property of such city free from all liens and encumbrances whatsoever.

"Such city shall within six months after such annexation becomes effective upon agreement with the owners of such public improvements or utilities as to fair value thereof, pay said fair value, as of the effective date of such annexation, into the court in such annexation or other proceeding, provided the same, or the use thereof, may by said city be made subject to the same charges or assessments imposed by such city upon or for the use of other like public facilities, and all liens and encumbrances upon said public improvements or utilities shall be transferred to the money so paid into court, and the court shall make distribution of such money to the persons entitled thereto, having due regard to the interest of all persons therein, and to enable the

court to make proper distribution of such money, it may, in its discretion, direct inquiries to be taken by a special commissioner to be appointed by it in order to ascertain what persons are entitled to such money, and in what proportion, and may direct what notice shall be given of the making of such inquiries by such special commissioner.

"In event the owners of such public improvements or utilities and said city are unable to agree upon such fair value, then upon it appearing to the court in such annexation or other proceeding at any time after the annexation decree becomes effective that the said owners and the city are unable to agree, or, in any event, upon the expiration of said period of six months, said court shall, upon the petition of any party in interest, appoint three disinterested appraisers, any two of whom may act, for the purpose of ascertaining the fair value of such improvements. * * * Before entering upon the execution of their duties, said appraisers shall take an oath before an officer authorized by the laws of this state to administer an oath to the effect that they will faithfully and impartially ascertain the fair value of such public improvements or utilities. Said appraisers shall have full power to hear proper evidence and the court, or any member thereof, may, on the application of such appraisers or of any party in interest, require the attendance of witnesses and the production of books, documents and any other papers at any hearing before such appraisers and after a full hearing before them, said appraisers shall ascertain the fair value of such public improvements or utilities and shall make report to said court of their findings. Said report and the certificate of the officer administering said oath shall be forthwith returned to the Clerk's Office of such court where it shall remain for at least ten days for exception thereto by any party in interest. Upon a hearing on any exception to said report, the court shall have the power to increase, decrease or confirm the award of the appraisers, from which action of said court any party in interest shall have the right of appeal to the Supreme Court

of Appeals of Virginia, as is in general conferred and provided for by law. * * * ”

The effective date of the annexation was December 31, 1941. Long before, in 1925 and 1926, both Windsor Farms and Grove Improvement, as they will be hereafter referred to, constructed upon their respective properties utilities consisting of water and gas mains and sewers. After having obtained permission from the city to connect such utilities with those of the city, the plats of the subdivisions were submitted to the engineer of the city and were approved by him.

In the case of Windsor Farms, Inc., a contract was entered into between the corporation and the city providing for a supply of water to be delivered in the water mains of the corporation. The eleventh clause of that contract is as follows: "that should all or any portion of the territory now without the city limits, in which the said main or any part thereof is located, be hereafter taken into the city, then the said main, or so much thereof as shall be located in the streets and alleys as laid down in the plans of annexation or in any such territory as may actually be used as streets and alleys, shall become the absolute property of the city of Richmond in accordance with city ordinance of February 12, 1925, and an Act approved March 21, 1924 (Acts 1924, p. 713), which provides for reimbursement to the owners for public improvements installed in territories adjacent to cities and towns."

A similar contract was entered into between the same parties providing for the supplying of gas to the gas mains of Windsor Farms. These contracts were in force when the annexation became effective. The utilities of Windsor Farms were of a high order of materials and construction. The incident work was done at the instance of T. C. Williams, Jr., a man of wealth, who was the principal person in the exploitation of the development, which was apparently a hobby of his.

The appropriate part of the city ordinance of February 12, 1925, contains this statement, "in the event of annexa-

tion * * * * the value of such gas and water mains * * * * to be paid to the said T. C. Williams, Jr., therefor shall be determined in accordance with the provisions of an act which provides for the reimbursement to the owners * * * ." The act referred to is what is called the "Plat Act," from which we have copiously quoted as controlling in this case.

It is true that the construction of the utilities of both developments was under the supervision and inspection of the city. Indeed, as to Grove Avenue, it was required so to be by an amendment to an ordinance of the city approved June 3, 1925, and the work was to be done under plans and specifications furnished by the city. It is not clear whether they were actually so furnished. In the opinion of the court which is a part of the record is this statement:

"It is undisputed that the plats of these subdivisions were submitted to the engineer of the city of Richmond and duly approved by him." In our view of the case, however, we do not think it is of any great moment.

The city and the owners of Windsor Farms and Grove Improvement subdivisions were unable to agree upon a fair valuation of the respective utilities. Resort was then had to the terms of the statute (Plat Act) in such case made and provided. Both subdivision owners filed petitions stating the failure of agreement, after futile efforts to that end, asking the annexation court to appoint appraisers for the purpose of ascertaining and determining the fair value of the utilities to be paid by the city to the petitioners. Three appraisers were appointed who were experienced engineers and construction men of high repute. After being fully instructed of their duties and functions under the law (Plat Act), they had a number of hearings at which men of expert and technical knowledge of utilities and their values and particularly those of the character and nature involved in this case, appeared and testified in detail and at great length. These witnesses were presented by each of the parties in interest.

We quote certain of the instructions of the court as follows:

"Instruction No. 2. The City of Richmond is required to pay into Court, for the benefit of each petitioner, separately ascertained, the fair value as of December 31, 1941, of the works of improvement or utility, the ownership of which was so acquired by the City."

"Instruction No. 4. The appraisers, in ascertaining and determining fair value shall consider all the facts and circumstances which reasonably throw light thereon; the actual original cost of construction of the improvements, and, in the event definite actual cost is, in any particular, not available, the estimated original cost; the estimated cost of reproducing said improvements as of December 31, 1941, under conditions then existing; the estimated cost of reproducing said improvements as of December 31, 1941, under conditions existing at the time the improvements were originally installed. But the comparative weight to be given to any particular form or character of cost must depend upon all the facts and circumstances of each individual case."

"Instruction No. 10. The appraisers shall report in writing to the Court the fair value of said improvements as of December 31, 1941, stating in each instance the principles and reasons upon which their report is based, giving tabulations showing the result of the application of the various methods of ascertaining cost considered by them, and otherwise preparing their report in such detail as will enable the court to review the same, if called upon so to do; and with their report they shall return a transcript of the evidence taken before them."

The appraisers filed on January 29, 1944, a very full and complete report which includes their analysis of the evidence, inspection, instructions, ordinances and contracts.

It will be noted that the Act provides that the city shall pay the owners the *fair value* of the improvements or utilities and this is emphasized by its repetition five times. The appraisers were confronted with the problem of determining the meaning of the term as used and they were told by the court the various elements to be considered in arriving at it. They were to consider all the facts and circumstances

which reasonably shed light upon it. They were to consider original actual or estimated costs of construction of the improvements and the estimated cost of reproducing them as of December 31, 1941, under conditions then obtaining and also under conditions existing at the time the improvements were originally installed. The weight, however, to be given to any particular form or character of cost, must depend upon all the facts and circumstances of each individual case.

The appraisers found "that the bases of fair value are the physical items going to make up the utilities and these only."

As to Windsor Farms, they made the statement: " * * * we adopt reproduction costs as of December 31, 1941, under conditions then existing in our finding of Fair Value."

We note that Windsor Farms, through its expert witness, Mr. Saville, placed the fair value of its utilities at some sum between $378,958.36 and $458,016.14. It accepted the result of the appraisers' finding, which was $279,521.00. This was confirmed by the lower court. Consequently that utility owner is no longer concerned with this appeal except to the extent of insisting upon the alleged merit of its assignment of cross-error, as to the date from which its claim to interest should begin, and also its insistence that the ruling of the lower court as to costs, and the fact of the allowance of interest at all, should be affirmed. It is also in accord with the provisions of the decree as to the percentage of yearly depreciation of its sanitary sewer system. In this regard the appraisers had placed the yearly depreciation of both of the utilities as to this item at 2% and an additional 2% depreciation upon that of Grove Improvement on account of what they termed its poor construction, indicating that the system would have to be taken up and rebuilt.

In the case of Grove Improvement, the appraisers found that the fair value of its utilities is the depreciated reproduction cost as of December 31, 1941, under conditions then existing. Grove Improvement placed the fair value of its

utilities at $53,000.00. The appraisers' finding was $28,-945.00, and the award of the court below was $35,217.00

The court arrived at its figures by deducting 2% yearly depreciation from the original cost of production.

The appraisers arrived at their figures by deducting 2% yearly depreciation from the reproduction cost as of December 31, 1941, the date of annexation, plus an additional 2% depreciation of the sewer system.

The meaning of the term "fair value" as used in the statute and how it is to be ascertained in the particular case, is the source of the difficulties with which we are met in solving the problem before us. That it is a vexing and troublesome question has been the subject of frequent judicial comment. This court has been concerned with the valuation of properties of corporations in what are known as rate cases. The governing principles in the determination of values in those cases are similar but not quite identical with those obtaining in the case in judgment.

The act in question (Plat Act) has never been the subject of adjudication by this court, nor is there an exact statute in any of the states so far as we know. It may be said that it is an anomaly in the statutory realm.

It must ever be borne in mind that the case comes to us under and by virtue of its provisions. Without its sanction, the parties could not in such case be before us. It is in derogation of the common law and must be strictly construed. Its meaning cannot be enlarged by construction beyond its express terms.

In *Hannabass* v. *Ryan*, 164 Va. 519, 525, 180 S. E. 416, this court said of Section 2154 (190): "We must bear in mind that this section of the statute, while remedial, is in derogation of the common law and therefore must be strictly construed. * * * It must be presumed that the legislature acted with full knowledge of the strict interpretation that must be placed upon a statute of this nature."

We have stressed this because it is urged that a contract between the owners of the subdivisions and the city, and certain city ordinances, which provide for submission of the

plats of the subdivisions, and the specifications and plans of construction to the city for its approval, which was actually done, and in the case of Grove Improvement, inspection was made by inspectors furnished by the city but paid by the owner, have the effect to modify the provisions of the statute to the extent of the provisions of the ordinances and those of the contract which are in conflict with the statute.

The fifth clause of the city ordinance approved April 17, 1925, provides that in the event of the subsequent annexation of the property the value of the utilities mentioned and the amount to be paid Grove Improvement therefor, shall be determined in accordance with the provisions of the Plat Act, which provides for the reimbursement to the owners for the public improvements installed. The pertinent provisions of the other ordinances and contracts are much the same.

We are told that these import a practical interpretation of the provisions of the Plat Act and are of much significance to show that it should be so viewed and construed as providing for reimbursement.

In our thought this is putting into the statute an element that is a stranger to it.

There is nothing uncertain or ambiguous about its language. Fair value and reimbursement are not convertible terms. To say that the Act provides for reimbursement to the owners is to read into it something that is not there. It says in terms that if the city and the owners can agree as to the *fair value* of the utilities, then the city shall pay *said fair value*, as of the effective date of such annexation. If they cannot agree upon *such fair value*, then, upon the petition of any party in interest, appraisers shall be appointed, who shall take an oath to faithfully and impartially ascertain the *fair value* of such utilities.

We are not in accord with the notion that the ordinances and contracts evince a practical construction of the statute.

Did any one, official or otherwise, construe it, who was charged with the duty of administering it?

Did the administrative officials of the city of Richmond and the owners of the utilities have the authority to contract away the solemn mandates of a statute which is the very basis of the whole thing and without which there could be no such proceeding? As to the contention of a practical construction, it is enough to say that none of the conditions is present which would make such construction effective.

The case of *Hancock Co.* v. *Stephens* (1941), 177 Va. 349, 14 S. E. (2d) 332, is enlightening. There even the interpretation of a statute by the Virginia Real Estate Commission, providing for the necessity of a license for a real estate broker, was rejected by this court. We said through Mr. Justice Spratley:

"The fact that Hancock acted in good faith and did all that was required of him by the commission does not alter the plain provisions of the statute. We must construe the law as it is written. An erroneous construction by those charged with its administration cannot be permitted to overrule the clear mandates of a statute. Amendments of the statutes or exceptions thereto can only be added by the legislature and not by the courts or the administrative officers of the State. The power to change or amend a law is a power to make law."

We cannot concur in the reasoning of the lower court that the approval or disapproval of the city of the plans and specifications of the owners of the utilities is effective as bearing upon the significance of *fair value* as it appears in the statute. It may have been of evidentiary value under instruction No. 4. It is fair to say that the appraisers seemed to give commendable heed to all the facts and circumstances which would reasonably throw light upon the problem they had in hand, that of ascertaining the *fair value* of the works of improvement or utility as of December 31, 1941.

The case of *Danville* v. *Forest Hills Develop. Corp.* (1935), 165 Va. 425, 182 S. E. 548, is almost a counterpart of this except that that city did not have a population of as much as 100,000, and therefore the Plat Act did not apply

to it. The facts of the two cases are very similiar. The *Danville Case* was decided under common law principles. Forest Hills Corporation instituted an action to recover from the city of Danville compensation for the improvements which it had constructed in the territory which the city had annexed. The jury rendered a verdict in favor of the city which the trial court set aside and entered final judgment for Forest Hills in the sum of $49,810.55, with interest and costs.

The plaintiff did not make any claim for the sidewalk and other street improvements but based its right of recovery upon the ground that, as a result of the annexation proceedings, the city appropriated the water mains, gas mains, and sewer mains, fire hydrants, and lighting equipment to its own use, without compensation, and was, therefore, liable to it for the fair value of the properties. This court reversed the judgment of the trial court and entered judgment for the city in accordance with the verdict of the jury. This court said in part:

"When the Forest Hills Development Corporation constructed the improvements on the property in question, it was done in order to make the lots in the development salable. It had merely pursued the usual course in developing real estate property contiguous to a city for speculative purposes by laying off streets, sidewalks, etc.; on the ground, and installing water, gas and sewer mains under the ground, to provide such facilities as an inducement to the purchase of its lots. These facilities would have been useless and there would have been no purchasers, unless the corporation had induced the city to consent to their being connected with the city system, as was done. The corporation did not, and could not have expected to, derive any revenue for the gas, water and electricity furnished to its purchasers by the city, and, in consequence, when the annexation took place it lost nothing whatever by the fact that the city continued to furnish gas, water and electricity to the residents of the annexed territory. On the other hand, the corporation was relieved of the cost of the future maintenance of

the facilities mentioned, which burden fell upon the city when the territory was placed by the annexation within its corporate limits. The corporation was also relieved of the expense of lighting its streets and the water supply for its hydrants, which it had to pay the city before the annexation. In other words, it seems to us that the plaintiff below had everything to gain and nothing to lose in consequence of the city having assumed control of these facilities, and, therefore, suffered no damage thereby. The Development Corporation had sold at the time of the annexation a large number of high-priced lots in the subdivision which were served by these facilities, in the sale price of which the enhancement in value representing the cost of the improvements had doubtless been included. We are, therefore, unable to see any reason for permitting the corporation to hold the city for the cost of these improvements under the circumstances.

\* \* \* \*

"It, moreover, seems plain that when the water mains, pipes, etc., were constructed by the plaintiff as an inducement to the purchase of its lots, the plaintiff thereby dedicated said mains and pipes to the use of the lot owners, and has no right to claim adverse ownership in or remove same without such lot owners' consent."

This court cited the case of *Ford Realty, etc., Co.* v. *Cleveland*, 30 Ohio App. 1, 164 N. E. 62 as follows:

"In so far as we learn from the record, the water pipes that were laid by the Ford Realty and Construction Company were for the purpose of enhancing the value of their own allotment, and, undoubtedly, the enhanced value of the lots was charged against the property owners who purchased lots in this allotment, who probably would not have purchased them but for the installation of the water."

The court further said:

"Let us suppose that before annexation, all of the lots in the subdivision had been sold to purchasers, none of whom would have purchased but for the installation of the water supply, and the purchasers had erected residences com-

plete throughout the subdivision, could the Suburban Real Estate Company sell and transfer the mains and pipes, etc., thus depriving the purchasers of lots of the benefit of water? We are of the opinion that, having sold the lots on the representation of furnishing water, and a means having been provided therefor, the Real Estate Company would not be heard to claim ownership in the water mains, with right to remove the same."

It is thus readily seen how this court has determined the rights of litigants making similar claims as those presented here, to which it would, doubtless, adhere but for the intervention of the statute (Plat Act) which changes the situation entirely under the changed conditions obtaining. We will presently undertake to show the bearing of the *Forest Hills Case, supra,* upon the equity feature invoked in this case and to which the utility owners devote several pages of their brief.

As we have seen, the appraisers found the fair value of the utilities of Grove Improvement to be the depreciated reproduction cost of said utilities as of December 31, 1941. Grove Improvement excepted to what it termed the failure of the appraisers to give any regard and effect to the original cost of the utilities as an element to be considered in arriving at fair value.

The court sustained the exception in the following language:

"The exceptions of Grove Improvement Corporation to the finding of the appraisers that fair value is to be based on reproduction cost is sustained, and we adopt the actual field cost of $43,920.00 shown in their table No. 3, as the proper basis."

The court deducted from the "actual field cost" the percentage of depreciation of the water and gas system, adopted by the appraisers, and 2% depreciation of the sewer system rather than 4% which was the appraiser's estimate.

Thus the major difference between the court and the appraisers is that the former chose the original cost and the latter the reproduction cost as their respective bases.

We think that the basis of the exception of Grove Improvement is not sustained by the record.

The appraisers reported that in arriving at their conclusion they took into account "all the elements of testimony, exhibits presented, terms of the Plat Act, and the physical inspection made" and they gave consideration to all the facts and circumstances, which would reasonably throw light thereon, in each individual case.

█ A careful examination of the report, including its analysis of the testimony, its reasoning and the tables listing the items of cost and depreciation under each method or basis of reckoning, convinces us that the exception should have been overruled and that the ruling of the court was error.

The subject of the fair value of utilities and corporate property is an intricate one which has long vexed the courts and those charged with its ascertainment.

*Petersburg Gas Co. v. Petersburg*, 132 Va. 82, 92, 103, 110 S. E. 533, 20 A. L. R. 542, was a case which involved the value of property for rate-making purposes.

This court said through the eminent Judge Burks:

"The subject is beset with difficulties, and no hard and fast rule can be safely laid down for fixing values for rate-making purposes.

\* \* \* \*

"Several methods have been suggested as helpful in ascertaining the value of property for rate-making purposes. One of these is to take the reproduction cost, less observed depreciation. As a general rule, and where the utility has not been allowed to earn in the past a depreciation reserve greater than the observed depreciation, this seems to be the fairest method and the one best supported by authority, and as the State Corporation Commission attempted no other, and apparently adopted this method, in part at least, it is unnecessary to make further reference to other methods."

*Roanoke Waterworks Co. v. Commonwealth*, 137 Va. 348, 356, 119 S. E. 268, is another rate-making case. The fixing of proper rates to be charged required a valuation of the

property of the company. Of the general theme this court said, through Kelley, P.:

"The subject involves inherent difficulties which up to the present time have baffled the best expert and judicial minds in their efforts to evolve a system sound and just in principle and uniform in application. The reported decisions upon the subject by rate-making bodies and by the courts are in a state of conflict and confusion."

While the above statement is doubtless accurate, we think the weight of authority favors reproduction cost less depreciation as the sounder basis for the ascertainment of the fair value of physical properties of corporations and utility companies.

Orgel on Valuation Under Eminent Domain, at page 630, says:

"On the other hand, reproduction cost is given weight in condemnation cases almost to the exclusion of original cost, while in rate cases, original cost is often given great, if not dominant, weight."

In 1 Whitten-Wilcox, on Valuation of Public Service Corporations, page 354, it is said:

"The United States Supreme Court has not been friendly to actual cost as the measure of fair value or just compensation, or as a dominant factor in determining either of these things. The court continually has laid emphasis on the concept 'value' as distinguished from 'cost' and upon 'present' value or 'value at the time' the property is being used as distinguished from the value at some earlier period."

And on page 538, this is said:

"As a measure of just compensation for property taken for public ownership, whether or not the property has been already devoted to public use under private ownership, actual cost to the owner is regarded as of minor importance in most cases, except when the public has obtained an option to purchase at actual cost through the provisions of a valid contract."

For authority for this statement the author cites *Willcox v. Consolidated Gas Co.* (1909), 212 U. S. 19, 29 S. Ct. 192,

53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; *Southwestern Bell Tel. Co.* v. *Public Service Comm. of Missouri* (1923), 262 U. S. 276, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; *Bluefield Waterworks, etc., Co.* v. *Public Service Comm. of West Virginia* (1923), 262 U. S. 679, 43 S. Ct. 675, 67 L. Ed. 1176.

In the case of *Simpson* v. *Shepard* (1913), 230 U. S. 352, 454, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, one of the celebrated Minnesota Rate Cases, the court said through Mr. Justice Hughes:

"It is clear that in ascertaining the present value we are not limited to the consideration of the amount of the actual investment. If that has been reckless or improvident, losses may be sustained which the community does not underwrite. As the company may not be protected in its actual investment, if the value of its property be plainly less, so the making of a just return for the use of the property involves the recognition of its fair value if it be more than its cost."

*Consolidated Gas Co.* v. *Newton*, 267 F. 231, 238, is a rate fixing case but it involved the valuation of the Gas Company's properties and this was said through Judge Learned Hand:

"The rule of the present reproduction cost, which is a necessary consequence of the foregoing argument, appears to me to have been either expressly or implicitly recognized in all the cases in which the Supreme Court has passed on these matters."

These cases are cited in support of the text:

*Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19, 41, 29 S. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153, 35 S. Ct. 811, 59 L. Ed. 1244; *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1, 10, 29 S. Ct. 148, 53 L. Ed. 371; The Minnesota Rate Cases, *Simpson* v. *Shepard*, 230 U. S. 352, 434, 454, 455, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; *San Diego*

*Land, etc., Co.* v. *National City,* 174 U. S. 739, 757, 19 S. Ct. 804, 43 L. Ed. 1154; *San Diego Land, etc., Co.* v. *Jasper,* 189 U. S. 439, 442, 23 S. Ct. 571, 47 L. Ed. 892; *Darnell* v. *Edwards,* 244 U. S. 564, 568, 37 S. Ct. 701, 61 L. Ed. 1317.

It seems to us that reproduction cost new, less depreciation, is a less variable measure of present fair value than original cost or historical cost. That it is more dependable is what Mr. Justice Hughes doubtless had in mind when he spoke of the possibility of the actual investment being "reckless or improvident."

The actual investment, or original cost, or historical cost, might be as variant and whimsical as the nature and notions of the planner and designer. Indeed, we have before us an impressive illustration of this very thing in the case of the Windsor Farms development. It was fashioned, in many of its features, in accordance with the fanciful dreams of its creator. It was an elaborate conception expensively executed, the cost of which bore only an inflated relation to its fair value, as is evidenced by the excess of the highest valuation, fixed by its chief witness, over the amount actually awarded, which excess was $178,495.14.

If original cost in that instance had been adopted as the measure of present fair value the result would have been out of proportion with any fair view of right.

We pass to another feature of the case, the weight which should be given to the report of the appraisers.

As the statute has never been construed by this court, we employ the analogy between appraisers and commissioners, in land condemnation cases. With the latter we have had to do, and the books contain a plenty of judicial expressions relating to the weight and importance to be attached to their reports.

We can only treat the subject cursorily, for this opinion has already been prolonged to an extent that we had not thought of.

In the case of *Duncan* v. *State Highway Comm.,* 142 Va. 135, 147, 128 S. E. 546, this court quoted with approval the following:

"In *Richmond, etc., Ry. Co.* v. *Seaboard Air Line Ry.*, 103 Va. 399, 404, 49 S. E. 512, 514, Judge Whittle said:
█ " 'In the very nature of things the findings of the commissioners is entitled to great weight and is not to be disturbed unless it is shown to be erroneous by clear proof. The commissioners are disinterested parties; they act under the solemnity of an oath, and are selected by the court from a conservative class of citizens, freeholders, on account of their peculiar fitness for the service to be rendered. They also possess the advantage of inspecting the property and of seeing the witnesses and hearing them testify.' "

We have no hesitancy in saying that this estimate should be accentuated in the case of the report of appraisers under the Plat Act.

As we have seen, they were men of high repute and large experience in their field of activity. They were trained and educated engineers and were selected and appointed to give the court the benefit of their knowledge, experience and expert opinion. They were disinterested persons of character and ability. Their report proclaims the quality and thoroughness and accuracy of their work. It has not been shown to be erroneous by clear proof, and their finding, in our opinion, should not have been disturbed.

In regard to the rate of depreciation of the sewers in Grove Improvement we are at odds with the court as to the assessment of only 2%, and in agreement with the appraisers in fixing it at 4%, for reasons already discussed.

The lower court based its holding on the fact that although the city was not required by the "Plat Act" to do so, nevertheless since it "assumed the authority to supervise the building of the sewers in question," it is estopped to claim the benefit of the greater rate of depreciation, even though that be the actual rate which should be applied in arriving at the value of the system.

█ In our opinion, no question of equitable estoppel is here involved. It is true that the city, under an ordinance, had its inspectors supervise the installation of the sewer sys-

tem. But this was for the purpose of seeing that the system was fit to be connected with the city system. The Grove Improvement Corporation was in no way misled to its prejudice by anything which was done by the city or its inspectors. There is no evidence or even any claim that the presence of the city inspectors brought about the faulty construction, or that the Grove Improvement Corporation would have constructed the system in a better manner if they had not been on the job. The claim is that the inspectors fell short of their duty to the city, their employer.

The inspection by the city cannot impair the vitality of the act.

The appraisers were right in their position that there was no going concern value, inhering in the utilities of either of the subdivision owners. The court confirmed this finding to the extent of holding that such an element was not to be considered in this case, saying that the utilities of these subdivisions were installed for the purpose of being operated in connection with the public utility system of the city of Richmond and not for revenue production for the landowners. It said further:

██ "When the landowner receives the fair original or reproduction cost of his utilities less a fair depreciation, he receives fair value for his utilities. This is all that the statute authorized him to receive. He is entitled to nothing more."

It may be said in this connection, which comment is applicable also to other phases of the case, that the city did not deprive either of the utility owners of anything at the time of annexation. It annexed the territory and with it went, of course, the utilities, but the lot owners, present and future, enjoy the identical comforts and conveniences which the utilities have afforded heretofore and will afford hereafter. The presence of the utilities enhanced the value of the lots, which was reflected in the sale prices.

The trial court in commenting upon the reciprocal advantages of the utilities to the city and the landowner said:

"He installs such utilities to enable him to sell his lots.

On the other hand, the city, through its control of the materials used, the method of installation and connections made, is assured of a valuable and proper functioning system of utilities * * * * ."

Continuing to enumerate the benefits to the city of ready constructed utilities, it points out that the lessening of the burdens of annexation explained why the officials of the city were instrumental in securing the enactment of the Plat Act "which was drawn by the then City Attorney".

This Act of the city officials may present a flavor of selfishness but its graciousness to the landowner is not to be lost sight of, for the Act secures to him the payment of the fair value, within its terms, of utilities for which he had already been indirectly paid, and which were subsequently held by this court to have been dedicated to the use of the lot owners and therefore not subject to the claim of adverse ownership. *Danville* v. *Forest Hills Develop. Corp., supra.* Of course, this case coming within the terms of the Act, is controlled by it, and as we have seen, the Act being in derogation of the common law, must be strictly construed.

We are of the opinion that the learned trial court was in error in allowing interest at all. The statute, which is alone the source of any recovery, does not provide for the payment of interest and consequently the appraisers' awards do not bear interest, certainly until the awards become a finality which, in the absence of adjustment, cannot be until the matter has run the gamut of the courts. Until such event, the claim is unliquidated. There would be no sum certain upon which interest could be computed.

It was said in the case of *Stearns* v. *Mason*, 24 Gratt. (65 Va.) 484, 494:

"This court has repeatedly held that when accounts were unliquidated and disputed between the parties, interest ought not to be allowed."

After citing a number of cases in support of the above statement, the court said further:

"These cases show that the court ought not to allow in-

terest when the claim, though just, is doubtful, or when the amount is unliquidated and uncertain."

Section 6259 of the Code of Virginia, known as the interest statute, has no application to this case.

This is not an action on contract or for tort, nor is it a suit in equity, all of which processes are subjects of that section.

This is a proceeding by way of petition, for the appointment of appraisers to do a specific thing, namely, to determine the fair value of certain utilities as of a certain time. It is purely statutory and the end to be attained is rather ideal until it becomes actual through the processes of the statute. Nothing is allowable outside of the statute. Fair value, in our notion of the statutory intendment, is, when ascertained, a sum certain, definite and fixed. If that sum is augmented by the addition of interest or anything else it is more than fair value and so more than the statute allows.

Upon the final determination of the matter when a definite sum shall be found, as fair value, it will carry interest from such time because it will bear the substance of a judgment.

Thus we hold that interest is not recoverable.

We now address ourselves to the last point which we shall consider and that is the question of the costs.

The trial court placed that burden upon the city and justified its action with the statement that the landowners had substantially prevailed. Have they substantially prevailed is an apposite query. When the amounts claimed by both landowners are compared with the amounts awarded by the appraisers and now by the court, the conclusion, it seems to us, is inescapable that the city substantially prevailed. The statute creating the liability gave the parties the right to get together by treaty or agreement. They failed in this. The circumstances furnish more than a surmise as to whose fault it was. If the landowners submitted to the city claims of the same amounts which they have asserted in this proceeding and the city declined them, which

it did, it seems fair to say that the fault lies at the door of the landowners for they wanted more than the statute accorded them. It is probably not an exaggerated thought that they presented claims for even more than was urged in the litigation. That is not unusual in business dickerings.

The city knew that, under the statute, it would have to pay for the utilities. The landowners graciously acknowledged that the city brought into being the Act which bestowed upon them such substantial benefits but, of course, the city resisted paying more than it thought was fair value. They were at antipodes. We do not know which was the more obdurate. We do know that the enforcement of the provisions of the statute was of real benefit to both contenders. We are mindful of the terms of the statute providing that the costs shall be borne as the court in its discretion may determine but, of course, that means none other than sound discretion. It is plain to us, as we have said, that the city substantially prevailed and the costs as a necessary consequent, should go against the utility owners.

We remand the case to the trial court for the entry of a decree carrying into effect the views expressed in this opinion which affirms the court in part and reverses it in part.

*Affirmed in part and reversed in part and remanded.*