## CIRCUIT COURT OF WASHINGTON COUNTY

W.

v.

Larry D. Jackson,
Commissioner of the
Department of Social Services

November 5, 1990

By JUDGE CHARLES H. SMITH, JR.

This matter is before this court on the petition and amended petition of appeal filed by the appellant seeking reversal of a "founded" disposition of emotional child abuse initially rendered against him by the Washington County Department of Social Services. The entire administrative record has been filed with the court, and counsel have submitted detailed memoranda of law outlining their respective positions with regard to all issues. The court has made a thorough review of the same.

This court has jurisdiction over this matter pursuant to § 63.1-248.6:1 of the Code. That section provides as follows:

> A. A person who is the subject of a report pursuant to this chapter and who is suspected of or is found to have committed the abuse or neglect complained of may, within thirty days of being so notified, request the local department rendering such report to amend such report and the local department's related records. The local department shall hold an informal conference or consultation in order for such person to informally present factual data, arguments or

submissions of proof to such local department. If the local department refuses the request for amendment or fails to act within thirty days after receiving such request, the person may, within thirty days thereafter, petition the Commissioner, who shall grant a hearing to determine whether it appears, by a preponderance of the evidence, that such report or record, in whole or in part, contains information which is irrelevant or inaccurate regarding the commission of abuse or neglect by the person who is the subject of the report or record and therefore shall be amended.

B. The Commissioner shall designate and authorize one or more members of his staff to conduct such hearings. The decision of any staff member so designated and authorized shall have the same force and effect as if the Commissioner had made the decision. The State Board of Social Services shall promulgate such regulations as are necessary for the conduct of such hearings. Such hearing officers are empowered to order the amendment of such report or records as is required to make them accurate and consistent with the requirements of this chapter or the regulations promulgated thereunder. If aggrieved by the decision of the hearing officer, such person may obtain further review of the decision in accordance with Article Four (§ 9-6.14:15 et seq.) of the Administrative Process Act.

This case has the following procedural history. On December 20, 1988, a child protective services worker employed by the Washington County Department of Social Services contacted the appellant and advised him that a complaint of child abuse had been made against him. After investigation by that agency, which did include interviews with the appellant in which he vigorously denied the charges, he was notified by the social worker by letter dated February 2, 1989, that the charges against him were "founded." The letter advised the appellant that his name and that of his child would be placed in the Central Registry in Richmond and would remain there for

ten years past the child's eighteenth birthday. It further advised him of his right to appeal to the local director within thirty days of receipt of the letter. The appellant did exercise his right to appeal to the director, and on February 24, 1989, the local director, G. D. Meade, M.S.W., held an informal conference which appellant attended with counsel but submitted no additional evidence. The local director affirmed the initial finding of emotional child abuse and so notified the appellant by letter dated March 21, 1989. In accordance with the statute, the appellant made a timely appeal of this ruling to the Commissioner of Social Services. On April 27, 1989, a hearing was held by the Commissioner's designated hearings officer, John L. Moody. The appellant appeared with counsel as did the child protective services worker from the local agency. Also present at the hearing was [the appellant's] father, who was not allowed to testify but whose testimony was proffered to the hearings officer. The hearings officer rendered his decision on July 14, 1989, affirming the initial "founded" complaint. The appeal to this court was timely filed.

The court's power and authority hereunder derives from Article Four (§ 9-6.14:15 *et seq.*) of the Administrative Process Act. Section 9-6.14:17 of that Article provides in part as follows:

> *Issues on review.* -- The burden shall be upon the party complaining of agency action to designate and demonstrate an error of law subject to review by the court. Such issues of law include: (i) accordance with constitutional right, power, privilege, or immunity, (ii) compliance with statutory authority, jurisdictional limitations, or right as provided in the basic laws as to subject matter, the stated objectives for which regulations may be made, and the factual showing respecting violations or entitlement in connection with case decisions, (iii) observance of required procedure where any failure therein is not mere harmless error, and (iv) the substantiality of the evidential support for findings of fact. The determination of such fact issue is to be made upon the whole

evidential record provided by the agency if its proceeding was required to be conducted as provided in § 9-6.14:8 or § 9-6.14:12 of this chapter or, as to subjects exempted from those sections, pursuant to constitutional requirement or statutory provisions for opportunity for an agency record and decision upon the evidence therein. When the decision on review is so to be made on such agency record, the duty of the court with respect to issues of fact is limited to ascertain whether there was substantial evidence in the agency record upon which the agency as the trier of facts could reasonably find them to be as it did . . . .

Initially, let me acknowledge that the court realizes that this matter has been submitted on counsel's respective memoranda which basically address constitutional issues, and the court is requested to rule thereon preliminarily. I further realize that counsel for the appellant have made requests to augment or supplement the evidential record which is now before the court before ruling on the merits. I am of the opinion that the above-referenced Code section precludes the court from the role of fact-finder and limits it to determination of issues of law. Admittedly, the "substantiality of the evidential support for findings of fact" is an issue of law for the court to determine. However, on this issue, the court is limited to "ascertaining whether there was substantial evidence in the agency record upon which the agency as the trier of facts could reasonably find them to be as it did." This Code section presupposes an agency record properly made up when it gets to this point. The court is not authorized to "supply agency action committed by the basic law to the agency." Section 9-6.14:19. That is not to say, however, that the agency record in this case was properly made up or that proper procedures were followed, and this shall be discussed *infra*.

The issues raised by the appellant in his brief are as follows:

A. Whether the regulations adopted by the Commissioner upon which the finding of child abuse was based exceed

the Commissioner's statutory authority and are inconsistent with the language of § 63.1-248.2;

B. Whether the regulations adopted by the Commissioner implementing § 63.1-248.2 are impermissibly vague;

C. Whether the Commissioner properly followed the regulations pertaining to the hearing and appeal process;

D. Whether [the appellant's] rights to due process as guaranteed under the United States and Virginia Constitutions were denied in that: (1) he was denied the right to confront his accusers; (2) he was denied the right to cross-examine the evidence against him in a fair, open and impartial hearing; (3) he was denied the opportunity to subpoena witnesses; (4) he was denied the right to present evidence of any witnesses other than himself in support of his claims; (5) evidence was used against him of which he had no notice and which he had no opportunity to test;

E. Whether the Commissioner's decision was supported by substantial evidence in the record.

I will discuss these somewhat out of order. As to the contention that the Commissioner has erred by failing to follow the dictates of the Administrative Process Act, I must agree with the Commissioner that such is not the case. The regulations adopted by the State Board and followed by the Commissioner are inconsistent with the Administrative Process Act. That is so because the provisions of the Act relating to case decisions do not apply to this type of situation. The General Assembly has provided, in § 63.1-248.6:1, for an appeal system to specifically deal with findings made in child abuse and neglect cases. As noted in the Commissioner's Brief in Opposition, there are irreconcilable conflicts between § 63.1-248.6:1 and the case decision provisions of the APA:

> a. Section 63.1-248.6:1 provides that the Commissioner shall designate one or more members of his staff to conduct the hearings. Section 9-6.14:14.1 provides that hearings shall be presided over by a hearing officer, an active member of the Virginia State Bar, selected from a list prepared by the Executive Secretary of the Supreme Court. The hearing officer is named by the Executive Secretary.

b. Section 63.1-248.6:1 places the burden on the appellant to prove, by a preponderance of the evidence, that the information and finding is inaccurate. Section 9-6.14:12 places the burden of proof on the proponent, which in this case would be the local agency.

c. Section 63.1-248.6:1 empowers the State Board of Social Services to promulgate regulations necessary for the conduct of such hearings. Nobody is given any authority to promulgate regulations governing the conduct of hearings under the APA. Indeed, the statutes themselves are reasonably specific as to the conduct of hearings, issuance of subpoenas, depositions, and request for admissions. This authority granted the State Board is inconsistent with the provisions of the APA and would essentially empower the State Board to perform a meaningless act.

d. Section 63.1-248.6:1 provides for further review in accordance with Article IV of the Administrative Process Act. If the matter was already governed by the provisions of the Act, the remedy provided in § 63.1-248.6:1 is a useless redundancy.

Commissioner's Brief in Opposition at 12.

The only time the provisions of the APA are implicated in a case of this nature are on appeal to this court by a party aggrieved by the decision of the hearing officer. Even then, only Article 4 (§ 9-6.14:15 *et seq.*) is applicable.

The appellant contends that the regulations adopted by the Commissioner exceed his authority, are inconsistent with statutory mandate, are impermissibly vague, and generally violative of his due process rights. Subsection B of § 63.1.248.6:1 empowers the State Board of Social Services to promulgate such regulations as are necessary for the conduct of hearings before hearing officers designated by the Commissioner. Section 63.1-248.6 of the Code provides, in part, as follows:

A. Each local department shall establish child-protective services under a departmental coordi-

nator within such department or with one or more adjacent local departments which shall be staffed with qualified personnel pursuant to regulations promulgated by the State Board of Social Services . . .

From the way this sentence is written, I am unsure whether it is the staffing with qualified personnel that must be done pursuant to such promulgated regulations, or whether it is the establishment of child-protective services that must be so done. I take it to be the latter. It is from the very narrow and nebulous prescriptions of these two Code sections that the Commissioner has undertaken to promulgate, adopt, disseminate, implement, and enforce a very comprehensive and complex set of regulations concerning the handling of child-protective services which cover everything from the initial report of abuse to expungement of an offender's record. Volume VII, Section III, pp. 1-85, of the Virginia Department of Social Services Manual. I believe the Commissioner, in so doing, has painted with too broad a brush. It is one thing for the Commissioner to promulgate administrative regulations and guidelines for the implementation of same. It is quite another for the Commissioner to presume the authority to prescribe definitions which are overly broad and general and in conflict with those contained in the statutes which enable his exercise of authority. Section 63.1-248.2 of the Code defines an abused or neglected child as follows:

A. "Abused or neglected child" means any child less than eighteen years of age:
1. Whose parents or other person responsible for his care creates or inflicts, threatens to create or inflict, or allows to be created or inflicted upon such child a physical or mental injury by other than accidental means, or creates a substantial risk of death, disfigurement, or impairment of bodily or mental functions;
2. Whose parents or other person responsible for his care neglects or refuses to provide care necessary for his health. However, no child who in good faith is under treatment solely by spiritual means through prayer in accordance

with the tenets and practices of a recognized church or religious denomination shall for that reason alone be considered to be an abused or neglected child;

3. Whose parents or other person responsible for his care abandons such child;

4. Whose parents or other person responsible for his care commits or allows to be committed any act of sexual exploitation or any sexual act upon a child in violation of the law; or

5. Who is without parental care or guardianship caused by the unreasonable absence or the mental or physical incapacity of the child's parent, guardian, legal custodian, or other person standing in loco parentis.

The Commissioner has adopted his own set of definitions of abuse and neglect. They can be found in the Virginia Department of Social Services Protective Services Handbook in Volume VII, Section Three, Chapter A, starting at page 2. Since this is a founded case dealing with emotional abuse or mental abuse, I will limit this to only that particular definition. It states as follows:

(5) *Mental Abuse*

(This type is often referred to as emotional abuse.) Mental refers to emotional, intellectual, or psychological functioning. The parent or caretaker inflicts or threatens to inflict injury to the mental functioning of the child. The child may or does demonstrate significant mental difficulty which is caused or perpetuated by a pattern of identifiable behavior by the caretaker. In the absence of such evidence in a young child, it must be clear that the caregiver clearly exhibits an identifiable pattern of harmful behavior.

*Guidelines*

(1) A child's mental difficulty can only be considered to be the result of mental abuse when there is a described or a demonstrated

relationship between caretaker behavior and the child's difficulty.

(2) Mental abuse may include, but is not limited to, caretaker behavior, or threat of behavior, which is rejecting, intimidating, humiliating, ridiculing, chaotic, bizarre, violent, hostile, or excessively guilt-producing. Violence includes but is not limited to exposure to physical violence between family members and/or caretakers and others. This could include violence against animals.

(3) These caretaker behaviors may be obvious or subtle, explicit, stated, or implied.

(4) Evidence of mental difficulties, after organic causes have been ruled out, include, but are not limited to: poor school performance, poor peer relationships, feeding and sleeping problems, lethargy, enuresis, stuttering, runaway behavior, depression, and suicide threats.

Virginia Department of Social Services Protective Services Handbook, vol. VII, § 3, ch. A, pp. 7-8.

I fail to see the authority for and question the necessity of the Commissioner's adoption of his own set of definitions of child abuse and neglect when the ones supplied by the General Assembly appear to be perfectly adequate. In so doing, I believe the Commissioner has overstepped the bounds of administration and entered the arena of legislation. I believe the Commissioner's definitions and guidelines are exceedingly broad and vague and overreach that which is contemplated by the statute. For example, the regulations allow a finding of mental abuse even in the absence of any mental injury to the child based solely upon the behavior of the parent or caretaker. In fact, the Commissioner's hearing officer in this case affirmed the department's founded disposition of emotional abuse since he found "that appellant's behavior did in fact inflict injury to the mental functioning of the child . . . ." Decision of Hearing Officer at 5. Further, as noted by the appellant in his brief:

The regulations provide that the child *may or does* demonstrate significant mental difficulty

caused by the behavior of the caretaker. The use of the verb "may" in the disjunctive and with the verb "does" in this manner allows a finding of mental abuse to be made even if the child does not demonstrate significant mental difficulty. In other words, the child may (or may not) demonstrate such injury.

Where regulation and statute conflict, the regulation must yield to the statute because that which is not supreme must yield to that which is supreme. *Brown v. Maryland*, 12 Wheat. U.S. 419 (1827). As the appellant correctly points out in his brief -- "Amendments of the statutes or exceptions thereof can only be added by the legislature and not by the court or the administrative officers of the state. The power to change or amend a law is a power to make law. *Richmond v. County of Henrico*, 185 Va. 176 (1946).

The appellant contends that the regulations adopted by the Commissioner are impermissibly vague. Again, I agree. The guidelines adopted by the Commissioner that supplement his definition of mental abuse provide as follows:

(2) Mental abuse may include but is not limited to caretaker behavior, or threat of behavior, which is rejecting, intimidating, humiliating, ridiculing, chaotic, bizarre, violent, hostile, or excessively guilt-producing
. . . .
(3) These caretaker behaviors may be obvious or subtle, explicit, stated, or implied . . . .

Under these exceedingly broad and vague guidelines, it is very easy for any lay person, not to mention the skilled, experienced professional social worker, to conceive of innumerable situations in which most any parent could be deemed guilty of child abuse. For example, as noted by the appellant:

> A parent who fails to attend his child's little league baseball games would probably be "rejecting" his child in the Commissioner's eyes. A parent who favors one child (however "subtly") necessarily "rejects" the other . . . . A parent who threatens a child with corporal punishment ("I'm going to wear you out") or with any kind of punishment . . . would be adjudged as "intimidating" the child . . . .

And the list, obviously, is endless.

The Fourteenth Amendment's prescription against vagueness extends to administrative regulations as well as penal statutes. Due process mandates that a statute or regulation provide sufficiently definite warning as to the prescribed conduct when measured by common understanding and practices. *United States v. Petrillo*, 332 U.S. 1 (1947). Because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. *Grayned v. City of Rockford*, 408 U.S. 104 (1972). In short, for an administrative regulation to pass muster under the due process clause, it must give a person of ordinary intelligence fair notice of what is required. *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972).

The definition and accompanying guidelines under which the appellant has been charged are exceedingly broad and vague and fail to give any citizen of the Commonwealth sufficient warning of what conduct might fall within their scope and subject them to the grievous penalty of being branded a child abuser. Under this definition and the accompanying guidelines, it is virtually left to the Commissioner to determine if a particular behavior is rejecting, intimidating, humiliating, ridiculing, chaotic, bizarre, violent, hostile, or excessively guilt-producing. As aptly put by the appellant in his brief:

> Parenting, like many other common endeavors of life, is admittedly an inexact science. Parents raise their children differently, depending on how they were raised, and their own morals,

> ideas and beliefs . . . . As currently worded,
> the prohibition contained in the department's
> regulations give no guidance and leave it to
> the Commissioner's intuition to determine whether
> or not to subject a parent to his arbitrary
> wrath for parenting practices with which the
> Commissioner disagrees.

Appellant's Brief at 18-19.

The appellant contends that the Commissioner has violated his due process rights. Again, I agree. In pouring over these statutes, regulations and guidelines, one is often inclined to ask, "What process is due a citizen accused of child abuse or neglect and when does it 'kick in'?" Certainly, it does not come at the initial stage when the accused is confronted by the caseworker and hit between the eyes with the accusation of child abuse. At this point, the experienced social worker has already conducted her investigation and made her assessment of the case. Presumably, she has taken statements and collected data from the complainant or complainants, the chid and perhaps the child's teacher, doctor, friends, neighbors, or extended family members. She might already have taken the child into immediate custody (§ 63.1-248.9); talked to the child's siblings (§ 63.1-248.10); had the child photographed and x-rayed (§ 63.1-248.13); and had physical and mental examinations of the child (§ 63.1-248.14). Faced with this wealth of knowledge, experience, and expertise by a powerful department of the state government, the accused is afforded the opportunity to make an oral rebuttal or explanation in his own defense. He is not allowed the opportunity to call or cross-examine witnesses. Indeed, the social worker is required to respect the complainant's anonymity and not reveal his or her identity to the accused. There are apparently no department regulations that require the caseworker even to interview persons named by the accused.

Nor do I think anyone would seriously argue that any due process rights are provided to the accused at the next level:

> informal conference or consultation at the local
> department.

Indeed, the local department is not even obliged to grant the request or to act at all, and if it does not, the accused may sidestep this level altogether and go directly to the Commissioner. *See* Subsection A of Section 63.1-248.6:1.

What process, if any, is due the accused at the hearing before the Commissioner? The Commissioner is obligated to:

> grant a *hearing* [emphasis added] to determine whether it appears, by a preponderance of the evidence, that such report or record, in whole or in part, contains information which is irrelevant or inaccurate regarding the commission of abuse or neglect by the person who is the subject of the report or record and therefore shall be amended . . . .
>
> B. The Commissioner shall designate and authorize one or more members of his staff to conduct such *hearings* [emphasis supplied] . . . the State Board of Social Services shall promulgate such regulations as are necessary for the conduct of such *hearings*. (Emphasis added.)

It seems clear to me that the mandate from the General Assembly by this legislation is that the hearing officers designated by the Commissioner conduct a hearing. A hearing is defined as follows:

> *Hearing.* Proceeding of relative formality (though generally less formal than a trial), generally public, with definite issues of fact or of law to be tried, in which witnesses are heard and parties proceeded against, have a right to be heard, and as much as the same as a trial and may terminate in final order . . . .

*Black's Law Dictionary* 649 (5th ed. 1979).

Obviously, the hearing at the Commissioner's stage is not "on the record," and it is difficult to conceive under our system of jurisprudence how a litigant can sustain a statutorily mandated burden of proof without

the benefit of being able to produce evidence or have evidence and witnesses produced. Indeed, even the Commissioner's own regulations promulgated in conformity with this Code section at least recognize the legislative intention for a hearing. They provide:

(3) *Hearing Officer's Powers and Responsibilities*

(a) The hearing officer shall set a convenient time within 45 days of the appellant's request for the parties involved to conduct the hearing. The hearing officer may reschedule the hearing upon good cause. The appellant may waive time deadlines.

(b) The hearing officer has no subpoena power or authority to administer oaths or affirmations.

(c) The hearing officer may accept all relevant evidence submitted during the hearing and shall not be bound by strict rules of evidence.

(d) Either party may have the hearing recorded by a court reporter. The hearing officer shall make or cause to be made an audio recording, a copy of which shall be available to either party.

(e) The hearing officer may defer his decision for a specific period not to exceed 14 days after conclusion of the hearing in order for either party to present additional evidence.

(f) The hearing officer may examine any witness and give the appellant and the local department an opportunity to examine any witness.

(4) *Hearing Procedure*

(a) All persons present shall be identified on the record. The appellant may be accompanied by an authorized representative.

(b) The hearing officer shall explain the purpose of the hearing and the procedures that will be followed. The hearing officer shall state that the appellant must prove by a preponderance of the evidence that the record

should be amended because it contains information which is irrelevant or inaccurate.

(c) The local department will submit a copy of all material in the local agency's record which contains information and documentation used to make the determination of "founded" or "reason to suspect," which shall be accepted into evidence by the hearing officer.

(d) The appellant will state his objections to the disposition reached by the local department and summarize the evidence supporting his conclusion. The appellant may submit any further relevant evidence not previously submitted to the local department.

Virginia Department of Social Services Protective Services Manual, vol. 7, § 3, ch. A, pp. 59-60.

The Commissioner's regulations create a right without a remedy. How can a litigant "examine any witness" or "submit any further . . . evidence" when his fact-finder/decision-maker has no subpoena power? Indeed, in all those hearings under the APA involving hearing officers appointed by the Executive Secretary of the Supreme Court, the appellants are entitled to have subpoenas issued requiring testimony or the production of documents or other physical evidence. It is only by virtue of the Commissioner's guidelines that an exception has been carved out for appellants in child abuse and neglect cases.

Both the Fourteenth Amendment to the United States Constitution and Article 1, § 2, of the Virginia Constitution provide that no individual shall be deprived of his life, liberty, or property without due process of law. These basic due process guarantees have been held to apply to governmental administrative action. *See Board of Regents v. Roth,* 408 U.S. 564 (1972). The fundamental requisite of due process of law is the opportunity to be heard at a meaningful time and in a meaningful manner. *Goldberg v. Kelly,* 397 U.S. 254 (1970). While strict compliance with the rules of evidence are generally relaxed in such hearings, they are still required to be conducted consistently with fundamental principles which adhere in due process of law. *Goldberg v. Kelly,* 297 U.S. 254 (1970);

*Southern Stevedoring Co. v. Voris*, 190 F.2d 275 (5th Cir. 1951).

The court in inquiring into whether or not an individual has suffered a due process deprivation must make a two-step inquiry. The first question is whether a liberty or property interest protected by the Fourteenth Amendment is at stake because of governmental action. If so, the next question is what process is due.

The Commissioner, in his brief, refers to numerous cases in which courts have denied constitutional challenges to statutes dealing with child abuse and neglect. The court here is not really concerned with the statutes but with the administrative regulations and guidelines promulgated by the Commissioner to carry out the statutory mandate. The Commissioner argues that the appellant has no liberty or property interest at stake as a result of the agency action in this case and that, therefore, the due process clause does not attach. The most that can happen, according to the Commissioner, is that the appellant's name will be placed in the "central registry" for ten years past his child's eighteenth birthday and that no media publication or other public dissemination thereof will be made. Thus, no loss of reputation is at stake nor loss of employment or employment opportunities, and therefore, no property or liberty interests protected by the due process clause are implicated. The Commissioner points to the case of *Paul v. Davis*, 424 U.S. 697 (1976), in support of his proposition that reputation in and of itself is not entitled to due process protection and that defamation, standing alone and apart from any other governmental action with respect to the plaintiff does not offend the Fourteenth Amendment. That case involved the public dissemination of a flyer identifying the plaintiff as a shoplifter. The plaintiff contended that such publication impaired his future employment opportunities. The plaintiff's employer reprimanded him but did not fire him from his job. The Commissioner likens that case to this one and reasons that even though some loss of reputation might ensue (which he does not concede), the appellant will suffer no loss of business . . . nor will [he] be deprived of any other liberty or other property interest. The appellant, of course, argues that because he has been branded a child abuser, his good name, reputation, honor

and integrity are implicated and that he suffers the danger of future disclosure which would certainly impact upon his . . . business and therefore his livelihood.

I do not believe the Commissioner seriously contends that the "central registry" is a dormant, inaccessible compilation of records of founded child abuse complaints. Indeed, even the Commissioner's own regulations specifies numerous persons or agencies that may have access to this information. I believe the Commissioner's regulations contravene that which is contemplated by the Virginia Privacy Protection Act of 1976. *See* Virginia Department of Social Services Protective Services Manual at 53-56. In what I would call the preamble to the Virginia Privacy Protection Act, the General Assembly has found:

> (1) That an individual's privacy is directly affected by the extensive collection, maintenance, use, and dissemination of personal information;
> (2) That the increasing use of computers and sophisticated information technology has greatly magnified the harm that can occur from these practices;
> (3) That an individual's opportunities to secure employment, insurance, credit, and his right to due process, and other legal protections are endangered by the misuse of certain of these personal systems . . . .

Section 2.1-378.

The definitions contained in § 2.1-379 of the Act clearly reveal that the central registry is an "information system" as contemplated by the Act and that the information contained therein is "personal information" and the appellant a "data subject" and subject to its provisions. The relative ease of access to this information either through the local agency or by virtue of the provisions of the Virginia Privacy Protection Act makes abundantly clear the necessity for due process protections to help insure that an innocent "data subject" is not erroneously entered to begin with.

In the case of *Fuller v. Edwards*, 180 Va. 191 (1942), the Supreme Court of Virginia recognized an individual

reputation as being a valuable property interest. The Supreme Court noted:

> The inherent rights of security in the person are not confined to security from violence done to the body . . . .
>
> Mr. Minor puts the right to reputation as among those absolute personal rights equal in dignity and importance to security from violence . . . .
>
> [T]hese primary rights may be reduced to three principal or primary articles; the right of personal security, the right of personal liberty, and the right of private property; because as there is no other known method of compulsion, or of abridging man's natural free will, but by an infringement or diminution of one or other of these important rights, the preservation of these, inviolate, may justly be said to include the preservation of our civil immunities in their largest and most extensive sense . . . .
>
> The right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation.
>
> One falsely charged as being afflicted with some disreputable disease or with being of ignoble origin may suffer more than he would through loss of limb in some automobile accident. He might be shunned by decent people, and his election to any post of honor or profit might be made impossible.

It is true, as the Commissioner notes, that more than mere injury to reputation is necessary to implicate due process. There must be "stigma-plus." This court can recognize numerous ways in which the appellant's liberty or property interests might be adversely affected by this agency action labeling him a child abuser . . . . Imagine the implications if the appellant tried to open a daycare center or even serve on the board of a daycare center for children; to serve on the board

of Big Brothers-Big Sisters, or to be a big brother to some child; to serve as a Cub Scout or Boy Scout leader; to serve as a youth leader in a church; or to coach Little League football, baseball, or basketball. The participation in some of these activities requires a records check and a background investigation. Considering the state of our law today, any club, group, organization, church, or other entity might well subject themselves to liability for negligently failing to make such investigation. Finally, suppose the appellant ever decided to run for public office. Considering the scandalous manner in which such campaigns are conducted nowadays, it would be naive to believe that this albatross would not raise its ugly head. Undoubtedly, the knowledge of these records checks and background investigations would severely compromise the appellant's ability and desire to engage in such activities and most likely would deter him altogether.

In today's society there is no more deplorable badge of infamy a person can wear than that of being a child abuser. There is no more stigmatizing nor ostracizing brand. Indeed, even convicts in our penal institutions have their own way of ostracizing and treating convicted child abusers. All of us are bombarded daily by things that remind us of this horrible cancer in our society: magazine articles, newspaper articles, books, movies, documentaries, TV ads, pamphlets, brochures, conferences, and seminars devoted to it, clubs and organizations and other citizens' groups devoted to it, toll-free numbers to call to report, etc. I do not really believe that the incidence of child abuse is any more prevalent in our society today than it ever was but only that the recognition of it and the reporting is more prevalent. This is influenced, to some degree, by all this publicity and by the fact that people may report anonymously and toll-free.

The protection of the safety, health, and welfare of infant children is a very laudable and worthwhile goal. However, it should be recognized that while all of these things that are designed to protect our children are well and good when used as a shield for them, it can also be a devastating sword even when applied in the most scrupulous and conscientious manner by the most well-intentioned social worker armed with the power and authority of the state against an accused who is virtually defenseless.

In consideration of all of the above, I am of the opinion that the Commissioner's action is not in:

 (i) accordance with Constitutional right, power, privilege, or immunity;

 (ii) compliance with statutory authority, jurisdiction limitations, or right as provided in the basic laws as to subject matter . . . .

 (iii) observance of required procedure where any failure therein is not mere harmless error . . . .

Thus, the court, being of the opinion that the action of the Commissioner was in violation of the appellant's due process rights under the Virginia and Federal Constitutions, declares such action to be null and void and of no force and effect and requires the department and any agency or person to whom any of this information concerning the appellant has been disseminated to expunge the same from their records forthwith.