# Richmond

CITY OF NORFOLK, ET AL. *v.* THE CHESAPEAKE AND POTOMAC TELEPHONE COMPANY OF VIRGINIA.

May 7, 1951.

Record No. 3762.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Miller and Smith, JJ.

296

The opinion states the case.

*Morton L. Wallerstein,* for the appellants.

*T. Justin Moore, William H. King, William G. Gassaway, John T. Quisenberry, George D. Gibson* and *John W. Riely,* for the appellee.

MILLER, J., delivered the opinion of the court.

The Chesapeake and Potomac Telephone Company of Virginia is a transmission company chartered and organized under our State laws. It owns and operates telephone lines and exchanges over a large area of Virginia, and through its properties, equipment and connections, furnishes exchange and toll service within and without this State. It will be hereinafter called the Company or appellee.

Under the provisions of section 156 of the Constitution of Virginia and Title 56, chapters 10 and 15 of the Code of 1950, the State Corporation Commission, hereinafter called the Commission, is empowered, authorized and required to fix and regulate the Company's rates and charges for intrastate service.

On April 14, 1949, the Company filed with the Commission its application for approval of a revised schedule of rates and charges which it sought to make operative in this State on May 10, 1949. Calculated upon its business volume obtaining as of the date of application, an increase of $2,300,000 annual net earnings was sought. To obtain that result, exclusive of taxes, an increase of about $4,000,000 in annual gross revenue was claimed to be necessary.

Appellee asserted and the record discloses that since the last rate increase was allowed on April 1, 1948, public demand for additional, more modern and increased telephone facilities and service had been urgent and tremendous. It had necessitated capital expenditures by appellee for plant and facilities at the

rate of about twenty million dollars a year. When this application was presented and the hearing had, public demand for more telephones was still urgent and unfilled orders for installation of thousands of telephones still existed which would necessitate continued yearly expenditures in capital investment of millions of dollars for some time to come. Appellee says that because of increased price of materials, higher wages and the higher overall costs incurred in the installation of thousands of new telephones and which will be incurred in the near future in meeting the public demand as compared with lower material prices, wage levels, etc., prevailing in the past when part of its phones were installed at present rates each new telephone earns a smaller part of its cost than older phones. Consequently, the earnings per present telephone with relation to the capital invested have been materially diminished and to such an extent that a fair return may not be now had on the invested capital.

The City of Norfolk, other municipalities and interested parties, hereinafter designated the intervenors or appellants, appeared, were made parties to the cause, and opposed any increase in the rates and charges for intrastate exchange and toll services. An exhaustive and thorough hearing was had. Evidence was heard by the Commission from time to time between June 13, 1949, and January 17, 1950. Witnesses on behalf of the Company and the intervenors testified in detail and evidence was given by members of the Commission's staff who had been assigned to investigate and study the Company's properties, records, accounts and manner of conducting its business.

About two months after conclusion of the hearing, separate written opinions were rendered by each of the three commissioners. The opinions of Commissioners Hooker and Catterall disclose that they were not in accord upon certain minor matters, nor did they employ the identical method or theory of evaluating the Company's properties. However, in their final conclusions they were in accord as to the overall value of appellee's property upon which it was entitled to earn a fair return. They found that value to be $92,331,063, which figure is commonly called the "rate base." They also agreed that a rate of return of approximately 6% (5.99%) should be allowed upon that rate base. Thus, in the final analysis and in the practical result reached, they were in agreement.

Commissioner King rendered a dissenting opinion. His find-

ing of fact relative to the value of the Company's property upon which it was entitled to a fair return was $92,000,000. However, he concluded that a 5½% rate of return upon the $92,000,000 base was sufficient to assure a reasonable increase in the Company's income and thus, in his opinion, afford an opportunity to obtain a fair return.

This voluminous record discloses the factual findings of the Commission's staff and through the testimony and exhibits taken and filed presents in detail the claims of the respective parties. The opinions of the three commissioners furnish abundant proof of the full, careful and painstaking consideration given by them to the evidence and to the conflicting contentions and theories advanced by the parties.

On the 27th day of March, 1950, the Commission's order was entered. It carried into effect the ultimate conclusions of Commissioners Hooker and Catterall as announced in their opinions and made operative as of April 1, 1950, an increase in rates and charges for intrastate telephone service so as to effect an increase of $2,100,000 in the Company's annual net earnings calculated on its property value and business volume as of September 30, 1949. The latter date represented and was the end of the last test period in which valuation and estimate of the Company's properties, gross income, cost of operation, etc., had been submitted to the Commission.

The intervenors appealed from the order of March 27, 1950, and presented twelve assignments of error. There are, however, two fundamental assignments relied upon which really include the other ten. They are:

(1) The rate base of $92,331,063, is claimed to be too high. They say that the final order was erroneous in fixing the value of the Company's intrastate property used or useful in the rendition of its public service as of September 30, 1949, at that figure, and contended that it should not have exceeded $82,345,566, and

(2) The rate of return allowed to the Company of approximately 6% (5.99%) upon this rate base was exorbitant, and thus so unreasonable and unjust as to be unlawful.

In performing the duties of promulgating and establishing reasonable and just rates and charges for transportation and transmission companies, the Commission exercises a legislative function. That it acts in that capacity, as distinguished from judicial, when it exercises its jurisdiction and power to

prescribe rates and charges for such public service corporations is made certain by the following language of subsection (b) of section 156 of the Constitution of Virginia:

"* * * The authority of the commission (subject to review on appeal as hereinafter provided) to prescribe rates, charges and classifications of traffic for transportation and transmission companies shall be paramount; but its authority to prescribe any other rules, regulations or requirements for corporations or other persons shall be subject to the superior authority of the general assembly to legislate thereon by general laws; * * *."

In construing this section of the Constitution in 1926, the Commission said:

"In matters pertaining to establishment of rates and charges of transmission and transportation companies the * * * Commission * * * exercises a purely legislative, not a judicial, function. It may be said to be the legislature of Virginia, so far as rate matters are concerned." (S. C. C. Report, 1926, p. 15. See also, *Chesapeake, etc., Tel. Co.* v. *Commonwealth,* 147 Va. 43, 136 S. E. 575.)

Speaking further on this subject in *Norfolk, etc., R. Co.* v. *Commonwealth,* 162 Va. 314, 174 S. E. 85, we said:

"It is exercising a purely legislative function; and, so far as such matters are concerned, is the legislative branch of the government." (162 Va. at p. 322.)

In fixing rates within the limits of what is confiscatory to the utility on the one side, and exorbitant as against the public on the other side, and thus definitely unfair and unjust to the telephone users, there is a reasonably wide area within which the Commission is empowered to exercise its legislative discretion. As it enjoys the full legislative power of the State within these bounds, the rate of return that it allows may not be changed or set aside as confiscatory or unreasonable and unjust unless it clearly evinces an abuse of legislative discretion.

Upon appeal (of right) to this court from an order of the Commission fixing rates and charges of a transportation or transmission company, the capacity in which we review the proceeding is, we think, made quite plain in subsection (g) of section 156 of the Constitution, which provides as follows:

"Whenever the court, upon appeal, shall reverse an order of the Commission affecting the rates, charges or the classification of traffic of any transportation or transmission company, it

shall, at the same time, substitute therefor such order as in its opinion the Commission should have made at the time of entering the order appealed from, otherwise the reversal shall not be valid. Such substituted order shall have the same force and effect (and none other) as if it had been entered by the Commission at the time the original order appealed from was entered.''

It is apparent from this language that upon appeal from an order of the Commission fixing rates and charges for a *transportation or transmission* company, we, in the first instance, judicially review the proceeding. If, and only if, upon this purely judicial examination error of law be found in the record which requires reversal of the order are we empowered to substitute our order for "such order as * * * the Commission should have made * * *." *Aetna Ins. Co.* v. *Commonwealth,* 160 Va. 698, 169 S. E. 859; *Norfolk, etc., R. Co.* v. *Commonwealth, supra,* and *Alexandria Water Co.* v. *Alexandria,* 163 Va. 512, 177 S. E. 454.

This, we think, is the interpretation and construction to be given to section 156. It affords the company protection against a rate of return so low and unjust as to be confiscatory and thus deprive the utility of its property without due process of law. It likewise affords protection to the public from imposition of a rate of return so high as to be unreasonable and unjust and so as a matter of law constitute an unconstitutional burden upon the telephone users.

We should also keep in mind what was said in the *Minnesota Rate Cases,* 230 U. S. 352, 433, 33 S. Ct. 729, 754, 57 L. ed. 1511, Ann. Cas. 1916A, 18, 48 L. R. A. (N. S.) 1151, and which was quoted with approval in *Chesapeake, etc., Tel. Co.* v. *Commonwealth, supra:* " 'The rate-making power is a legislative power and necessarily implies a range of legislative discretion. We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the Commission lawfully constituted by it, as to matters within the province of either.' " (147 Va. at p. 57.)

Upon undertaking to fix rates for a public utility company of this character, the Commission must necessarily first ascertain (a) the value of the Company's property used and useful in the rendition of its intrastate service, (b) its annual gross revenues, and (c) its annual operating expenses. Upon accomplishing these objectives, it must then determine upon and set the per-

centage rate of return at such a figure as will afford the utility reasonable opportunity to earn a fair and just return on its investment.

When a utility undertakes to secure a rate increase it usually attempts to establish a higher rate base or prove that it is entitled to a higher rate of return on the then rate base, or both. In this instance, the Company undertook to establish a higher rate base and also to secure an increased rate of return. It offered much evidence upon three methods or theories of valuation by which it sought to enlarge and establish the rate base.

Testimony and exhibits were presented to establish the value of the Company's property and plant under what is called the Reproduction Cost New, less depreciation, value on an (1) "as built" basis, and on a (2) "wholesale" basis.

The first of these methods of valuation undertook to estimate and thus show what it would cost to reproduce the Company's physical property and plant new if they were built in the same way and under the construction conditions experienced by appellee as and when built, but at the material prices, wages and cost levels obtaining on September 30, 1949. This estimate of Reproduction Cost New assumes that both piecemeal and wholesale construction would occur to a similar extent as actually experienced when the extensive and far-flung plant and properties were built. The Reproduction Cost New on a "wholesale" basis purported to present the estimated cost to reproduce the plant and properties new if they were constructed as a mass undertaking on a wholesale basis at the material prices, wages and cost levels likewise obtaining on September 30, 1949. In estimating the cost under the wholesale basis, it is assumed that during construction of the plant and properties the Company would be free from rendition of telephone service, and the work would thus be accomplished on a scale and basis tending to approach maximum efficiency and minimum cost which would therefore be more economical than upon an "as built" basis.

The third method of evaluation of the plant and properties was under the original cost investment theory. This valuation is and was ascertained and determined from the net original cost investment figures appearing on the Company's books. Both of the Reproduction Cost New estimates ("as built" and "wholesale") and the original cost investment valuation undertook to establish the value of all the Company's physical properties used

and useful in both interstate and intrastate business. The value of the property devoted or allocated to each type of service was then ascertained through an approved method of separation so as to thus segregate and determine the value of the intrastate property upon which the rate of return was to be fixed.

The Company contended that all of the evidence tending to establish the cost of reproducing the properties and plant new was relevant. It then insisted that it should be considered and accorded just weight by the Commission, along with all the other testimony and exhibits introduced to establish the actual investment cost and the ultimate valuation of the intrastate plant and properties arrived at by giving just weight to all pertinent evidence. It says reliance upon the original investment cost as the sole theory of valuation of the properties and plant which constitute almost the entire rate base is contrary to the settled law of Virginia. Cited along with others to sustain its contention are the following authorities: *Petersburg Gas Co.* v. *Petersburg*, 132 Va. 82, 110 S. E. 533, 20 A. L. R. 542; *Roanoke Water Works Co.* v. *Commonwealth*, 137 Va. 348, 119 S. E. 268; *Chesapeake, etc., Tel. Co.* v. *Commonwealth, supra; Richmond* v. *Henrico*, 185 Va. 176, 37 S. E. (2d) 873.

Appellants insisted that the valuation of appellee's property and plant should be ascertained by application of the original cost investment method and all testimony tending to establish valuation on either the reproduction new "as built" or "wholesale" basis should be rejected. They offered evidence upon this method of valuation, and also asserted that some of the items included in the Company's cost of construction valuation should not be allowed or considered in arriving at the rate base. They further contended that original cost investment should be adopted as the sole mode of valuation of properties and plant because they say the evidence disclosed that material prices, wages and other cost levels for acquisition and construction of properties and plant as of September 30, 1949, were much higher and more expensive than had obtained over the past years during which the properties and plant had been actually acquired and constructed. Among the authorities relied on to sustain their contention in this respect are: *Federal Power Comm.* v. *Hope Natural Gas Co.*, 320 U. S. 591, 64 S. Ct. 281, 88 L. ed. 333; *Equitable Gas Co.* v. *Pennsylvania Public Utility Comm.*, 160 Pa. Super. 458, 51 A. (2d) 497; *New England Tel., etc., Co.* v. *State*,

95 N.H. 353, 64 A. (2d) 9; *Board of Sup'rs* v. *Commonwealth,* 186 Va. 963, 45 S. E. (2d) 145.

All of the commissioners rejected the evidence offered by the Company under both Reproduction Cost New methods of valuation i.e., "as built" and "wholesale". Commissioners Hooker and King adopted and adhered to the original investment cost theory in making their valuations. That they differed slightly in the ultimate amount of the rate base was due to the fact that Commissioner Hooker included certain items which Commissioner King did not deem proper to include as capital investment. Commissioner Catterall, in making his valuation, applied what is commonly called the "Prudent Investment Theory"—i.e., a public utility is entitled to a return based only on its actual investment which is represented by the amount of capital which has been prudently put into the business. See *Federal Power Comm.* v. *Hope Natural Gas Co., supra,* and concurring opinion of Mr. Justice Brandeis in *State of Missouri* v. *Public Service Comm.,* 262 U. S. 276, 43 S. Ct. 544, 67 L. ed. 981, 31 A. L. R. 807, and concurring opinion of Justices Black, Douglas, and Murphy, in *Federal Power Comm.* v. *Natural Gas Pipeline Co.,* 315 U. S. 575, 62 S. Ct. 736, 86 L. ed. 1037.

In the final analysis and for all practical purposes, the Commission adopted and applied the method of evaluation contended for by intervenors because Commissioner Catterall's valuation, though made upon the prudent investment theory, produced in this instance the same figure as that determined upon by Commissioner Hooker under the original cost of investment method. This being true, appellants prevailed in so far as the method of evaluation adopted was concerned.

■ It should be kept in mind that the Commission exercises the State's legislative power and discretion in fixing rates. That it may consider all relevant testimony and evidence that is of assistance and helpful to it in the exercise of that discretion is not open to dispute. In the final exercise of its power and discretion, it should give weight to such evidence as is best calculated to enable it to determine upon rates that are reasonable and just to the utility and the public and reject that which is of no value in that respect and thus properly perform its function. That it should and may so deal with and appraise the evidence before it is from the nature of its undertaking axiomatic. So long as the evidence received and acted upon is substantial

and of such character and weight as to enable it to ascertain and fix upon fair rates and charges, its discretion cannot be said to have been abused.

However, as no cross-error was assigned by appellee to the refusal of the Commission to give weight to the evidence offered upon the estimated reproduction cost theories of valuation also relied upon by it, we are not required to and do not decide whether or not this evidence should have been accorded weight in this proceeding in the final determination of the rate base.

The value of the Company's undepreciated property and plant was determined by all the commissioners to be $113,032,368. There was then deducted from that figure a depreciation reserve of $23,382,530, leaving the figure of $89,649,838, as the depreciated, basic and chief item in the rate base. To that were added two items—one represents the value of materials and supplies on hand about to be or being currently used in the rendition of its service, amounting to $1,473,008; and the other is cash working capital of $1,208,217, found to be necessary to be used in the conduct of the business. The total of these several items so determined upon and amounting to $92,331,063, constitutes the net value of the properties and plant found by the Commission to be used and useful by appellee in its intrastate service and is the rate base.

Intervenors object to the Commission's finding of fact in this respect and assert that the rate base is too high. They say that fixed as of September 30, 1949, it should not have exceeded $82,345,566. More specifically they claim it is erroneous because there were included in the original and undepreciated figure of $113,032,368, two items of $3,963,997, and $70,525, respectively, that should have been omitted. It is conceded in their brief that the depreciation reserve of $23,382,530, determined upon through an approved system of accounting, which gives effect to observed physical deterioration and functional depreciation resulting from obsolescence, inadequacy, etc., is reasonable and just to be deducted from the $113,032,368, if the latter figure is correct.

Appellants also contend that no allowance should have been made for materials and supplies on hand or for cash working capital and thus seek to eliminate the items of $1,473,008, and $1,208,217, and so reduce the net rate base. The first of these two items (both of which will be later discussed in more detail) was found proper by all commissioners and the second by two commissioners.

■ Turning first, however, to the two items complained of which were included by the Commission in the original undepreciated figure of $113,032,368, we find that the $3,963,997, constitutes money invested in telephone plant under construction, but which was not then actually used because construction had not been completed; and the much smaller item of $70,525, represents real estate held for telephone use and contemplated to be so used in the immediate future. It is sufficient to say that these items were deemed reasonable and proper to be included in the rate base not only by the Company's witnesses but by the Commission's staff. They represent money expended for plant needed and under construction, and money invested in property to be used and which, it is shown, will be used in the immediate future by appellee in the rendition of its public service.

As the Commission employed the net original cost investment theory of valuation in fixing upon the rate base, there can be no doubt that in the exercise of its legislative discretion it was fully justified in including these items. *Chesapeake, etc., Tel. Co.* v. *Commonwealth, supra,* and *Board of Sup'rs* v. *Commonwealth, supra.*

■ With reference to the material and supply item of $1,473,008, representing property on hand September 30, 1949, allowed as an item in the rate base, Commissioner Hooker well said: "Materials and supplies have always been considered as proper to include in rate cases here in Virginia."

The Company sought to be allowed $1,812,325 cash working capital as a reasonable sum of monetary capital on hand to conduct its business efficiently until payment should be received from customers for the service already rendered. That was reduced by the Commission to $1,208,217. (Commissioner King thought it should be only $900,000.) The Company contended that the sum it sought to have allowed represented approximately one month's operating expense (less depreciation and taxes) necessary to be maintained as capital due to a lag of about thirty days between the rendition of service to its customers and its receipt of revenue therefor. It appears that a thirty day allowance has at times been deemed reasonable and proper, but the sum sought was reduced because it factually appeared that there was actually only about a twenty day lag in the collection of revenue for intrastate service. This, we think, was justified, and the sum allowed reasonable.

All of appellee's physical properties and plant are located in Virginia wherein it furnishes intrastate telephone service. Yet through its connection with the American Telephone and Telegraph Company, (hereinafter called the American Company), and affiliated companies composing what is known as the Bell System, it furnishes interstate service. Its properties and plant thus afford to its customers dual service though the fixing of rates and charges for interstate service is under the jurisdiction and control of the Federal Communications Commission. It thus becomes necessary to find and apply an acceptable and satisfactory means or formula for allocating a fair value on the Company's property, revenues and expenses as if used solely in intrastate service. In short, the value of appellee's property must be separated according to the actual use to which it is put by the two classes of service to the end that a proper allocation may be made to intrastate use and proper rates determined on that value. *Smith* v. *Illinois Bell Tel. Co.*, 282 U. S. 133, 51 S. Ct. 65, 75 L. ed. 255.

The character of the property used and the nature of the services rendered make it impossible to effect a separation of interstate and intrastate property, revenues and expenses by simply physically placing on one side certain property and facilities as if solely used for intrastate service, and on the other side, property and facilities as if devoted solely to interstate service. Consequently, the real objective to be accomplished becomes primarily an apportionment of the same facilities which are used jointly in both services.

To the end that a satisfactory method of separation of operations may be had in utilities of this character and the proper and just amount of property, revenues and expenses that should be solely allocated to intrastate service fairly determined upon, an extended investigation and study was begun about 1941 by a joint committee of the National Association of Railroad and Utilities Commissioners and the Federal Communications Commission. As a result of this undertaking and work, a manual was formulated and published in 1947 by the National Association of Railroad and Utilities Commissioners setting forth the procedure to be followed in making such separations. It is entitled "Separations Manual" and contains "Standard Procedures for Separating Telephone Revenues and Expenses."

It is not amiss to say that Mr. J. H. Brown, now Chief Ac-

countant on the Commission's staff was Chairman of the Sub-Committee which drafted the Manual and Mr. R. G. Ankner, a representative of the Federal Communications Commission, served on that Sub-Committee, both of whom testified in this proceeding.

The purpose of the Manual as described in its foreword is as follows:

"* * * Exchange and intrastate services are subject to the jurisdiction of the several state regulatory bodies and interstate services are subject to the jurisdiction of the Federal Communications Commission. The major portion of the telephone property of the companies is used in common for both intrastate and interstate services. Similarly the major portion of the expenses is incurred in the joint rendition of these services. Therefore, a uniform method of separation, acceptable to the state and federal regulatory bodies, is essential so that the property, revenues and expenses of each company subject to the respective jurisdictions may be determined."

All of the exhibits submitted to the Commission to establish intrastate operations, i.e., separations for plant as well as services and expenses, were based on the method of separation of intrastate operations from total company operations in accordance with the procedure outlined in the Manual. The three commissioners agreed that to date it provided the best method dealing with this intricate problem and applied the method of separation as therein outlined. It is briefly stated by Commissioner King as follows:

"According to the Separations Manual, the fundamental basis on which separations between interstate and intrastate services are made is the use of the plant for each of these services. Separations are made on the actual use basis, which gives consideration to relative occupancy and relative time measurement. Most of the property is separated on one of four different bases: first, on the basis of direct assignment; second, on the basis of traffic units; third, on the basis of conversation minute miles; and fourth, on the basis of subscriber line usage."

Intervenors objected to the use of that method of separation and through their expert witness, Dr. John Bauer, challenged its procedure. They assert that its method of separation is unreasonable and unjust and if followed in fixing intrastate rates would result in an unjust division of revenue derived from inter-

state service. Specifically, they contend (a) that the company is not really engaged in interstate telephone service but only furnishes terminal service on which basis it should be paid, and (b) that the Manual should be revised so as not to reflect solely in its separation procedure "use of property" but should also reflect the "value of service."

Their first contention that the Company merely furnishes terminal service on interstate calls, incoming and outgoing, for which it should be compensated on a terminal service basis cannot be sustained. In *Smith* v. *Illinois Bell Tel. Co., supra,* (1930), it is said:

"The separation of the intrastate and interstate property, revenues and expenses of the Company is important not simply as a theoretical allocation to two branches of the business. It is essential to the appropriate recognition of the competent governmental authority in each field of regulation." (282 U. S. at p. 148.)

And in the *Smith Case, supra,* the trial court found: "That the Illinois Company owns and operates all the property in the city of Chicago used in interstate calls and connects with the property owned by the American Company at the city limits" of Chicago. This part of the business of the Illinois Company is interstate commerce. (*Illinois Bell Tel. Co.* v. *Moynihan,* 38 F. (2d) 77, 82, 3 J. Ct. N.D. Ill. 1930). And accordingly the Supreme Court of Illinois held that: "The interstate service of the Illinois company * * * is subject to the jurisdiction of the Interstate Commerce Commission (now Federal Communications Commission) which has been empowered to pass upon the rates, charges and practices relating to that service." (282 U. S. at p. 149.) See also, *Lindheimer* v. *Illinois Bell Tel. Co.,* 292 U. S. 151, 54 S. Ct. 658, 78 L. ed. 1182.

The entire rate on interstate calls being subject to the jurisdiction of the Federal Communications Commission, the proportion of the through rate to be received by the Company is likewise subject to the control of and fixed by that regulatory body and not by the State Commission. The service rendered on out-of-state calls being definitely interstate in character, to label it "terminal service" cannot give to the State Commission jurisdiction to increase interstate rates or demand such part thereof as it deems proper and thus indirectly fix and regulate interstate charges. *Terminal Railroad Ass'n* v. *United States,* 266

U. S. 17, 45 S. Ct. 5, 69 L. ed. 150, and *Re New Jersey Bell Tel. Co.,* 72 P. U. R. (N. S.) 37, 49.

The theory embodied in intervenors' second contention that the procedure or method of separation of intra- from inter-state operations should reflect the "value of the service" rather than "use of the property", though considered by the experts who made the study and formulated the Manual, was rejected. The National Association of Railroad and Utilities Commissions —Federal Communications Commission's Sub-Committee in its published report of April 28, 1947, said:

"* * * Regulation of the telephone industry is vested in a number of state commissions and a federal regulatory body and the general concurrence necessary for adoption of appropriate factors to reflect *value of service* is therefore difficult to obtain. Furthermore, determination of relative value seems to have no direct bearing on an allocation of actual costs.

"For these reasons the Sub-Committee is of the opinion that further consideration of the *value of service* theory at this time is not warranted." (Emphasis added.)

And the Manual contains the following with respect to the "use of property" method adopted:

"The fundamental basis on which separations among exchange, state toll and interstate toll services are made, is the use of telephone plant in each of these services.

"Separations are made on the 'actual use' basis, which gives consideration to relative occupancy and relative time measurements."

As early as 1913, the method of separation adopted in the Manual as distinguished from that advocated by the intervenors was foreshadowed. In the *Minnesota Rate Cases,* 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, Ann. Cas. 1916A, 18, 48 L. R. A. (N.S.) 1151, we find the seed of that thought thus expressed:

"When rates are in controversy, it would seem to be necessary to find a basis for a division of the total value of the property independently of revenue, and this must be found in the use that is made of the property. That is, there should be assigned to each business that proportion of the total value of the property which will correspond to the extent of its employment in that business. * * *" (230 U. S. at p. 461.)

In the more recent case of *Smith* v. *Illinois Bell Tel. Co., supra,* (1930), which was the first telephone rate case in which

the United States Supreme Court was confronted with this particular question, Chief Justice Hughes said:

"The proper regulation of rates can be had only by maintaining the limits of state and federal jurisdiction, and this cannot be accomplished unless there are findings of fact underlying the conclusions reached with respect to the exercise of each authority. * * * While the difficulty in making an exact apportionment of the property is apparent, and extreme nicety is not required, only reasonable measures being essential, it is quite another matter to ignore altogether the actual uses to which the property is put." (282 U. S. pp. 149, 150, 151.)

We find no error in the record because the Commission adopted the method and procedure of separation prescribed in the Manual. In the words of Commissioner Catterall, "No better method of making the necessary separation is available, and, until a better method is available, the Separations Manual should be followed."

The rate base has been determined upon as of September 30, 1949, and placed at the sum of $92,331,063. To fix rates so as to afford the utility opportunity to earn a fair return upon that figure, it is necessary to first ascertain the rate of return which was being received by the Company as of that date upon that base. Then a justifiable increase (or decrease) in intrastate rates and charges may be awarded and the opportunity thus given to earn a fair and reasonable return upon the capital invested. The return being actually received may only be known by ascertaining the Company's annual revenues and net earnings from intrastate operations.

The revenues from intrastate operations for a six month test period ending on September 30, 1949, stated on an annual basis was found to be $33,092,106. Net earnings intrastate for the same six months test period on an annual basis upon a going level were by the Commission determined to be $3,436,782, which net earnings afford an approximate return of 3.7% upon the base of $92,331,063. Yet, if improper items have been included in operating expenses or if operating expenses have been overstated, the current net earnings would be really and in truth greater and the rate of return thus proportionately enlarged.

In passing upon the reasonableness and allowability of items claimed to be proper operating expenses, the Commission may not assume the duties or usurp the powers of the management:

"A commission is not empowered to substitute its judgment for that of the owners, who are responsible for the rendition of service, unless the owners have abused their discretion. * * *

"Only where affirmative evidence is offered challenging the reasonableness of the operating expenses incurred, on the ground that they are exorbitant, unnecessary, wasteful, extravagant, or incurred in the abuse of discretion or in bad faith, or are of a nonrecurring character not likely to recur in the future, has the commission a reasonable discretion to disallow any part of the expenses actually incurred." *Alabama Public Service Comm.* v. *Southern Bell Tel., etc., Co.*, 253 Ala. 1, 42 So. (2d) 655, at p. 674.

Upon examination of all items included in the Company's operating expense accounts, the Commission concluded that they were justified and properly allowable as operating expenses. Nevertheless, intervenors challenge certain items and their inclusion as annual intrastate operating expenses is assigned as error.

An item of $448,625, allowed by the Commission as a part of maintenance expense is challenged because one of the Commission's staff testified that it was in large part due to abnormal conditions and costs brought about by the heavy construction program in operation at that time and that it might not be a recurring expense in more normal times. It was, however, expended as a part of maintenance expense and though attributable to the fact that abnormal construction conditions called for more and expensive rearrangements, changes and relocations of equipment to be made, it was deemed a necessary expenditure by the management. The then existing circumstances and conditions which made its expenditure necessary as a maintenance expense as well as present conditions at large convince us that Commissioner Hooker's following observation was pertinent and true:

"Undoubtedly there have been some changes in costs, due to the heavy construction *alone,* during the immediate past period. Just how much and the amount cannot be definitely determined. Even if the amount due to the construction program alone could be determined, then we are faced with the fact that these costs will be continued for the immediate future or until the heavy construction program is complete, which the evidence shows will be another two to three years."

Confronted with a similar question in *Alabama Public Service Comm.* v. *Southern Bell Tel., etc., Co., supra,* (1949), the court there said: "It (the commission) stated that the cost of rearranging and changing existing telephone plant and equipment was included in the maintenance expense and that this expenditure was related to new construction. * * * (42 So. (2d) at p. 683.)

"* * * The veracity and competency of the Company's witnesses were not questioned. The economy and efficiency of management were not challenged and there was no proof of bad faith, waste or extravagance. We think that the lower court was correct in holding that the amount of this expense was proper for 1947 and that there was nothing in the evidence to indicate that this item of expense would be less in the foreseeable future. * * *" (42 So. (2d) at p. 684.)

We find no error in the allowance of the challenged item as a current and probably recurring maintenance expense.

The Company maintains a pension plan for its employees which became effective January 1, 1913. Under it all money paid into the fund by the Company is irrevocably dedicated to pension purposes and may not be recovered by appellee. The plan is maintained upon what is commonly called the actuarial basis, and is contributed to only by the Company. It is similar to that adopted and obtaining in associated companies of the Bell System. Monthly payments are made into the fund (of which the Banker's Trust Co. of New York is the trustee) in such amounts that when employees are eligible to retire there will be funds available to pay the pensions. This requires that there be set aside annually on an actuarial accrual basis funds sufficient to make payment to eventual pensioners of the stipulated benefits provided for in the plan. No contention is made that the pension payments and benefits are excessive. But intervenors object to the plan or method adopted whereby a fund is accumulated and contend that the pensions should be paid each year out of current earnings and as the employees qualify therefor. In short, they say no funded payment plan should be used whereby the Company sets aside as an operating expense money for future pension payments, but that it should adopt what they entitled the "pay-as-you-go-plan", i. e., pay pensions as necessary out of gross current earnings.

The evidence discloses that the Commonwealth of Virginia

and the City of Richmond use the funded plan. The accrual method likewise obtains in the plans adopted by the United States government in the Social Security and Railroad Retirement Acts, and many industrial and utility companies use it. The propriety of accrual plans for pensions has been approved in many court decisions. *State* v. *Tri-State Tel., etc., Co.,* 204 Minn. 516, 284 N. W. 294; *In re Northwestern Bell Tel. Co.* (S. D.), 43 N. W. (2d) 553; *Alabama Public Service Comm.* v. *Southern Bell Tel., etc., Co., supra; State* v. *Department of Public Service,* 19 Wash. (2d) 200, 142 P. (2d) 498.

That the management of the company, in the exercise of its judgment, was entitled to select a sound funded plan as a method of pensioning its employees, and the Commission justified in approving that plan and the current expenditures made thereunder, seems put at rest by the decision of *State* v. *Tri-State Tel., etc., Co., supra,* wherein we find:

"In deciding whether a specific claim for allowance for payments for such purposes should be granted, the commission must necessarily give due consideration to the discretion exercised by the management in establishing a pension system. If the amounts are reasonable and are actually paid as pensions, or are allocated to a fund in pursuance of a feasible plan whereby it is assured that the sums so allocated will be used to pay pensions in reasonable amounts, allowance should be made." (284 N. W. at p. 316.)

See also, *In re Northwestern Bell Tel. Co., supra.*

The Company's management in the exercise of its judgment adopted the pension plan and there is no evidence in the record to show that they abused their discretion. The Commission has therefore approved the plan and allowed the annual expenses incurred thereunder. *Alabama Public Service Comm.* v. *Southern Bell Tel., etc., Co., supra.*

Upon this judicial review, it is clear that we may not disturb the Commission's action in this respect.

Appellee and nineteen other telephone companies constitute what is commonly called the Bell System. This telephone system through the several companies renders nation-wide service and operates about 80 per cent of all the telephone business in the United States. All of the voting stock of most of these associated companies, including appellee, and the majority of the voting stock of the others, is owned by the American Com-

pany. It also owns 99.8% of the voting stock of Western Electric Co., Inc., and 50% of the stock of the Bell Telephone Company Laboratories, Inc., both of which are non-telephone companies. The former of these two companies (Western Electric Company, Inc.) in turn owns the other 50% of the stock of the Bell Telephone Laboratories, Inc. The Laboratories Company is a research and development company, which is operated for the benefit of the Bell System. The American Company holds an agreement called a license contract with each of its twenty subsidiary companies composing the Bell System. Under it each subsidiary, including appellee, pays the American Company one per cent of its gross annual revenues for which, in turn, they each receive valuable services from Bell Laboratories. The payments made by appellee for these services were included in the operating expense as is done by all of the other operating companies.

In 1926, the payments made by this and other companies to the American Company for services rendered by the Bell Laboratories were on the basis of 4½% of gross annual revenues. *Chesapeake, etc., Tel. Co.* v. *Commonwealth, supra.* Since then the percentage paid upon gross annual revenues has been reduced from time to time until on October 1, 1948, it was placed on a one per cent. basis. Immediately prior thereto it had been upon a one and one-half per cent. basis. It is established that the services performed are valuable and rendered substantially at cost. Intervenors, however, insist that the actual cost of performing the service and not a percentage of gross revenues is the proper amount to be paid and should control for rate-making purposes. The Commission's finding upon the factual issue presented with its reasons for the inclusion of this expense as an annual operating charge discloses that the services now being rendered and to be rendered in the near future are commensurate with the payments made and to be made therefor.

Commissioners Hooker and Catterall thus respectively state that factual finding and conclusion: Commissioner Hooker said: "* * * we are of opinion that the present rate of 1% will not at this time produce payments in excess of the reasonable cost of such service." And Commissioner Catterall: "The services are very valuable and are rendered substantially at cost. * * * The cost has to be apportioned among the operating companies; and, since the purpose of the service is to help them make money

by increasing their efficiency, the amount of money they take in is a fair standard for the apportionment of the cost."

Standard license contracts of this character have often been approved by the courts as appears from the following decisions: *Southern Bell Tel., etc., Co.* v. *Public Service Comm.*, 203 Ga. 832, 49 S. E. (2d) 38; *Alabama Public Service Comm.* v. *Southern Bell Tel., etc., Co., supra; Pacific Tel., etc., Co.* v. *Public Utilities Comm.*, 34 Cal. (2d) 822, 215 P. (2d) 441; *Pacific Tel., etc., Co.* v. *Flagg,* (Or.), 220 P. (2d) 522.

We find no error in the Commission's approval of the contract in question and its allowance of the payments thereunder as an item of annual current expense.

Over a test period of six months an expense of $120,319 was incurred by the Company in making studies and assemblying data needed to show what it would cost to reproduce its plant and property at the present time. Annualized it amounts to $240,638, but this does not include all of the expenses incurred in this proceeding. Intervenors object to the Commission's having treated the latter figure as a current and recurring expense and insist that it is a non-recurring expense. Though incurred as a rate case expense in this proceeding substantially the whole sum represents salaries and expenses of regular company employees assigned to do this work who would have had to be paid without the pendency of this proceeding. In short, when included in the test it represented payment to company personnel to perform this necessary work to which they were temporarily assigned and who would have been paid a like sum anyhow. It does not, therefore, represent an abnormal or non-recurring expense and may not be excluded as being an improper item to include as a current expenditure.

The Western Electric Company, Inc., though not a public utility and thus not subject to governmental regulation, is an important subsidiary in the Bell System. It manufactures and sells to the several telephone companies in the system all equipment used by them and supplies to them parts purchased from other sources. It is the manufacturing, purchasing and supply unit in the Bell System.

Over a period of thirty-three years its profit margin on its sales to the Bell System, including the Company, has been about 4.2 cents per dollar and its average return on net investment has been 7.3 per cent, though its earnings in periods and at

times have fluctuated widely. Price comparisons with other companies disclose that it has supplied the Bell System and thus appellee with needed products and equipment, at as reasonable prices as could have been obtained elsewhere. Consequently, intervenors' complaint that Western Electric's profit margin is excessive and thus unreasonable profits are obtained by the American Company at the expense of appellee is without merit.

■ The standard or rule by which to measure the fair return to which a utility is entitled, we find stated thus:

"* * * What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties; but it has no constitutional right to profits such as are realized and anticipated in highly profitable enterprises or speculative ventures. The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties * * *." *Bluefield Water Works, etc., Co.* v. *Public Service Comm.*, 262 U. S. 679, 692, 693, 43 S. Ct. 675, 67 L. ed. 1176.

"The rate of return on such 'fair value' which the utility company should be allowed to receive should be fair and just to the company and such as will make its securities attractive to investors when the company is prudently and carefully operated." *Petersburg Gas Co.* v. *Petersburg, supra.*

Money for capital investment has been obtained and employed in the past by the Bell System upon the ratio or basis of about one-third debt capital and two-thirds stock or equity capital. However, the large and expensive construction programs that have been necessary in recent years have caused an increase in its debt obligation until its relation to equity or stock obligation has reached a ratio of about 50-50%. Though money for capital needs may be obtained more cheaply by issuance of debt securities and obligations than by sale of stock, there is a

limit to the amount that may be borrowed prudently. Debt securities enjoy certainty of obligation and fixed interest and maturity payment dates, and it appears that debt capital is obtainable by the Bell System at a rate of about 3% or slightly less. Yet if the proportion of debt obligation increases beyond a prudent ratio to equity (stock obligation), that increase of debt obligation will be reflected in rising interest charges on the debt and deteriorating stock value.

Appellee is a wholly owned subsidiary of the American Company and is financed as an integral part of the Bell System. It obtains needed capital from the American Company upon its debt and equity obligations and that Company, in turn, secures it from the investing public by sale of its debt obligations and stock. The significance of the ratio of debt obligation to that of equity obligation has in this instance to do immediately with the Company for the Commission is fixing a just rate of return for appellee and the public it serves and not for the Bell System or the American Company. However, as it is by the means stated and as an integral part of the Bell System that appellee acquires needed capital from the American Company the ratio of debt to equity obligations of the Bell System (and of appellee as a unit therein) must be kept in mind when the Commission undertakes to fix a just rate of return.

The public policy of Virginia as set out in section 56-478.1 of the Code of 1950 requires the extension of telephone service when proper revenue is assured. To meet the continued and urgent public demand to enlarge and improve its service, the utility must be able to readily obtain money for needed capital investment. As the ratio of debt to equity obligation of the Bell System (and of appellee as a wholly-owned subsidiary or unit thereof) has increased to 50%, in order to protect the public service and to attract investors it is necessary and desirable that the debt ratio be decreased, and, as expressed by Commissioner Catterall, "* * * the only way it can reduce its debt ratio is by getting new capital from stockholders. The only way it can get new capital from stockholders is by earning enough to make issues of stock attractive to investors."

If one-third (33 1/3%) of capital is represented by debt obligation at 3% and the balance of two-thirds (66 2/3%) by stock issue that realized a 7½% return the utility would in that event be paying an overall cost of 6% for capital provided the stock

was marketed for par. If capital ratio of one-half debt at 3% and one-half stock is maintained (instead of one-third debt and two-thirds stock) and the return of 6% on the ascertained base remain the same, a higher return than 7½% on par stock should result, for the ratio of outstanding stock to the less costly outstanding debt obligation would be less. However, due to many factors, the return on stock actually fluctuates from time to time and that risk must be assumed by investors in the stock. So as a practical matter, the debt ratio must be reasonable and safe and the rate of return on the base such as to pay interest on the debt and afford reasonable assurance to investors that the utility under prudent management will be able to meet the economic obligation to pay reasonable dividends. Otherwise, its equity capital (stock) will not be attractive to investors and thus not readily salable.

Just what dividends its stock may or may not pay cannot be determined and is not the criteria or measuring stick by which its rates are or can be fixed. But that the rate be such that under prudent management it may pay reasonable dividends upon its stock is required, for that, along with other considerations, is necessary to attract new capital.

With the above principles in mind and recognizing the present economic demands, the Commission fixed a rate of return of 6% on the determined rate base of $92,331,063, which would afford a net return of $5,539,864. The actual annual net earnings received by the Company as of September 30, 1949, were $3,436,782, which is approximately 3.7% on that base, thus disclosing that rates had to be increased and adjusted so as to secure an additional net income of $2,103,082, to earn the approximate 6% rate to be allowed on the ascertained base. To obtain this additional net income of $2,103,082, the annual gross revenue had to be increased in the sum of $3,564,456. To otherwise state it, there must be an increase in the present rates and charges of the Company sufficient to realize additional annual gross revenue of $3,564,456. Accordingly, the Commission disallowed in part the increase in rates sought by appellee in its application filed April 1, 1949, but did, by its order of March 27, 1950, allow in most part the increases sought.

The effect of its order was to adjust and increase rates and charges so as to allow a gross annual increase in revenue of $3,564,456, instead of the approximate $4,000,000 asked for in the

application. This increase in gross revenue will provide an additional net income of $2,103,082, (instead of the approximate net increase of $2,300,000 sought by appellee).

This final conclusion of the Commission was, we think, within their legislative discretion and justified by the evidence.

Lastly, intervenors complain of the sources from which the increased revenue is to be obtained because it is secured by increasing the rates of residence and business telephones. Specifically, they say that part of it could and should be raised by increasing the public and semi-public coin box rates for local calls from five to ten cents and thus lessen the burden on residence and business telephones. Evidence was offered by them to the effect that $700,000 additional revenue could be obtained by converting the public and semi-public coin boxes to ten cent boxes and fix that charge for local calls.

Aside from the initial expense of about $300,000 required to replace or physically change about 7,500 of the 9,000 coin boxes now in use so as to efficiently operate them with the ten cent coin, there was much evidence to the effect that the additional annual revenue claimed to be so obtainable would not be much more than 50% of intervenor's estimate. Therefore, the Commission in the exercise of its discretion declined to order a change in the coin boxes and install a ten cent charge for local box calls.

Where, how and from what precise source or sources the increased revenue awarded is to be obtained is primarily an administrative duty and undertaking to be exercised by the Commission. Obviously, we are not entitled to substitute our judgment in the premises for that of the Commission unless their discretion in that respect has been definitely and clearly abused. The evidence bearing upon the advisability of making a change is conflicting and we find no abuse of discretion in the Commission's refusal to impose a ten cent charge for local box calls.

Upon a careful review of the record, we find no error in the order of March 27, 1950, and it is accordingly affirmed.

*Affirmed.*