## Richmond

CLIVE L. DuVAL, 2d, ET AL. v. VIRGINIA ELECTRIC AND POWER COMPANY.

JAMES L. RIDGILL, JR. v. VIRGINIA ELECTRIC AND POWER COMPANY.

September 5, 1975.

Record Nos. 750028 and 750132.

Present, All the Justices.

*William Dana Shapiro, Assistant County Attorney; Robert L. Weinberg (Frederic Lee Ruck, County Attorney,* on brief), for appellants in Record No. 750028.

*James L. Ridgill, Jr. (William R. Trenor,* on brief), for appellant in Record No. 750132.

*George D. Gibson (John W. Riely; Evans B. Brasfield; Guy T. Tripp, III; Hunton, Williams, Gay & Gibson,* on brief), for appellee in Record Nos. 750028 and 750132.

COCHRAN, J., delivered the opinion of the court.

On August 20, 1974, Virginia Electric and Power Company (Vepco) filed its application with the State Corporation Commission, pursuant to Code § 56-245,[1] for a temporary emergency rate increase to produce additional gross annual revenues of $127,346,000. After a public hearing at which evidence was introduced by Vepco, by the Commission Staff and by various intervenors, the Commission, by order entered October 1, 1974, denied motions to dismiss and authorized temporary rate increases to produce additional gross annual revenues of $97,700,000. Pursuant to the order, Vepco filed revised rate schedules and gave bond to insure prompt refund, with interest, of

---

[1] Code § 56-245 provides:

"Whenever the Commission, upon petition of any public utility, is of the opinion and so finds, after an examination of the reports, annual or otherwise, filed with the Commission by such public utility, together with any other facts or information which the Commission may acquire or receive from an investigation of the books, records or papers, or from an inspection of the property of such public utility, or upon evidence introduced by such public utility, that an emergency exists, and is of the opinion and so finds that a hearing to determine all of the issues involved in the final determination of the rates or service will require more than ninety days of elapsed time, the Commission may, in case of such emergency, enter a temporary order fixing a temporary schedule of rates, which order shall be forthwith binding upon such utility and its customers; provided, however, that when the Commission orders an increase in the rates or charges of any public utility by means of such temporary order, it shall require such utility to enter into bond in such amount and with such security as the Commission shall approve, payable to the Commonwealth, and conditioned to insure prompt refund by such public utility, to those entitled thereto, of all amounts which such public utility shall collect or receive in excess of such rates and charges as may be finally fixed and determined by the Commission; and provided, further, however, that no such temporary order shall remain in force or effect for a longer period than nine months from its effective date, and a further period not to exceed three months in addition if so ordered by the Commission."

all amounts in excess of such rates and charges as may be finally fixed and determined by the Commission.

These appeals challenge the constitutionality of Code § 56-245 (Repl. Vol. 1974), as well as the sufficiency of the evidence upon which the Commission's order was based.

■ Appellants argue that Code § 56-245 is unconstitutionally vague for failure to define the "emergency" which permits the Commission to grant temporary rate increases. The word "emergency", however, is not easily subject to misunderstanding. We have approved the definition of the word found in Webster's Third New International Dictionary as " 'an unforeseen combination of circumstances or the resulting state that calls for immediate action.' " *Portsmouth* v. *Chesapeake*, 205 Va. 259, 266, 136 S.E.2d 817, 823 (1964). Although no refinement of this simple definition, understandable by laymen and lawyers alike, is necessary, the Commission itself in its majority opinion fairly stated the threshold issue to be a determination whether the utility's ability to provide adequate and reliable electric service was in immediate jeopardy due to an emergency. We hold that the statute is not unconstitutionally vague.

■ Appellants further maintain that Code § 56-245 is unconstitutional because it delegates administrative powers without supplying adequate standards, in violation of principles established in *Ours Properties, Inc.* v. *Ley*, 198 Va. 848, 96 S.E.2d 754 (1957). But in that case we pointed out that a delegation of the power to exercise discretion, based upon a finding of facts, is not of itself improper. *Id.* at 852, 96 S.E.2d at 758. Here, there is such a delegation of power. The word "emergency" itself provides an adequate standard. It is no less definite and specific than the standard of "reasonable and just" by which the Commission is required to determine public utility rates under Code § 56-234 (Repl. Vol. 1974). This kind of terminology, delineating the policy framework within which a regulatory body is to make its findings of fact, has long been approved. Thus, in *American Power & Light Co.* v. *Securities & Exch. Com'n.*, 329 U.S. 90 (1946), the Supreme Court of the United States sanctioned, as establishing adequate standards, § 11(b)(2) of the Public Utility Holding Company Act of 1935, authorizing the Securities and Exchange Commission to require registered holding companies to take action if the continued existence of any company in a holding company system " 'unduly or unnecessarily complicate[s] the structure, or unfairly or inequitably distribute[s] voting power among security holders. . . .' " *Id.* at 97.

Appellants seek to distinguish *American Power & Light Co.* on the ground that in that case there was a legislative history, which they say is absent in the present case, to indicate the applicable standards. The evolution of present Code § 56-245 provides, however, a sufficient legislative history. Prior to its amendment in 1973 (Acts 1973, c. 262), Code § 56-245 had required the Commission, before granting a temporary rate increase, to find the following:

> "[T]hat the net income of such public utility, after reasonable deductions for depreciation and other proper and necessary reserves, is less than the amount required for a reasonable return upon the value of such public utility's property used and useful in rendering service to the public . . . ."

Obviously, to make such a determination the Commission would have been required to conduct a full-scale hearing, thereby defeating the purpose of the statute to afford an expedited method of providing emergency relief. It is clear that the legislature intended by the 1973 amendment to replace the requirement of multiple findings with the requirement of a single finding "that an emergency exists." A public utility is now entitled to a temporary rate increase if the Commission finds that an emergency exists that threatens to impair the utility's ability to serve the public. Thus, the several standards by which temporary rate increases were formerly to be determined have been replaced by the single emergency standard. In addition, the amendment left unchanged the other jurisdictional requirement, not in issue in this appeal, that the Commission find that a hearing to make a final determination of rates will require more than ninety days of elapsed time. We hold that Code § 56-245 is not an unconstitutional delegation of administrative powers without adequate standards.

Vepco applied for emergency relief on the basis of its alleged inability to finance its construction program. Appellants have challenged the sufficiency of the evidence supporting the Commission order in which a finding was made that an emergency existed and a temporary rate increase was approved. Consequently, the evidence as to the Company's financial status and the validity of its construction program is crucial in our review of the Commission's order.

T. Justin Moore, Jr., President of Vepco, testified that the construction budgets for 1974 and 1975, after reductions aggregating approximately $281 million, were $479 million and $487 million, respectively. He further testified that construction of generating plants

was necessary to meet even the reduced growth rate projected for the future; that plants require 6 to 10 years to complete; that certain facilities under construction, such as Fossil Unit No. 5 at Possum Point, scheduled for commercial operation in 1975, and Nuclear Units 1 and 2 at the North Anna Nuclear Power Station, scheduled for commercial operation in 1976, cannot be curtailed without severely damaging the Company's operations; that these facilities can be completed only with outside financing; that because of various restrictions only $55 million, a totally inadequate amount, can be raised by sale of additional bonds; and that financing construction through the sale of additional common stock can be accomplished only if greater earnings are obtained, through increased rates, to make the stock attractive to investors.

Moore further testified that Vepco had planned to sell 30-year mortgage bonds in July, 1974, but was unable to do so when Vepco bonds were downgraded by the two major bond-rating agencies; that alternative shorter term bond issues were sold at interest rates of 10.5 per cent and 11 per cent; that a proposed plan to sell about $95 million in common stock had to be abandoned because of the declining market price of Vepco common stock, selling, when Moore testified, at less than half its book value; and that Vepco's earnings had steadily declined and in July, 1974, the Company had suffered a net operating loss. The only alternative to rate relief, Moore asserted, would be the termination of all construction, which would have a disastrous effect on future service to the public.

Alvis M. Clement, Treasurer of Vepco, introduced financial statements showing, both for the entire system and for Virginia jurisdictional service, rate base, revenues and expenses, and rate of return and the rate of return anticipated from the additional revenues requested. He testified that because of the "indenture coverage", i.e., restrictions requiring that interest commitments be covered at least two times by earnings, only $55 million in additional bonds could be issued; that because of similar contractual restrictions no additional unsecured long-term debt is permissible; and that because of charter limitations, financing by issuing additional preferred stock is impracticable. He also testified that the ratio of market price to book value for Vepco common stock had declined from 268.2 per cent at December 31, 1967, to 38.3 per cent at August 29, 1974.

Stanley Ragone, a Vepco Senior Vice President, testified as to the projected load growth, and the necessity for completing the fossil fuel

and nuclear energy units under construction which are expected to save the Company and its customers about $150,000,000 annually, and for proceeding with other generating facilities that are needed to meet anticipated energy demands. He also testified as to the management's policy of maintaining 15 per cent to 18 per cent reserve of energy capability above anticipated peak load demand, and to the declining energy reserves of other utilities that might otherwise be able to supply additional energy to Vepco.

Vepco projected a rate of return on common equity of 15 per cent if the Commission granted the temporary rate increases that were sought. This rate of return on common equity was supported by Charles A. Benore, a specialist in the analysis of utility securities, testifying for Vepco, and Theodore J. Kormosa, of Merrill Lynch, Pierce, Fenner & Smith, Inc., an expert witness presented by the Commission's staff.

Vepco also presented the expert testimony of Irwin M. Stelzer, a consulting economist and Chairman of the Federal Power Commission's Technical Advisory Committee on the Impacts of Inadequate Power Supply. Stelzer testified that, in his opinion, failure to grant the emergency increase would risk further damage to Vepco's financial standing, increase in the cost of service to customers, delay in the construction of facilities presently needed to provide adequate service in the future, and inability to continue a nuclear program vital to the achievement of goals of a national energy policy. He was of the opinion that these risks were "large and irreversible", whereas the risk that the Commission might grant excessive increases prematurely was minimal in view of the refund provisions required in the emergency proceeding. He also testified that by 1979 other neighboring electric utilities would have energy reserves insufficient to furnish excess energy to Vepco.

The Commission found from the record that Vepco's short-term debt would amount to about $325,000,000 by the end of 1974, an "alarmingly high" figure, and that the Company's 30 per cent common equity was "too low" in view of the Commission's insistence that the capital structure be maintained "well within the range of 30 to 35 per cent common equity." The majority opinion stated that there was "a serious question whether common stock can be sold", and that Vepco "is presently in a critical financial posture and needs immediate and adequate relief." Therefore, the Commission found that the statutory requirements of Code § 56-245 had been met, a finding that is fully supported by the evidence.

There is no merit to the appellants' contention that the Commission failed to apply correct principles to determine what additional gross revenues should be approved. Upon a hearing on the Company's application for a permanent rate increase, the Commission will be required to determine the fair rate of return to which Vepco is entitled based upon findings made under principles established in *Commonwealth* v. *VEPCO*, 211 Va. 758, 180 S.E.2d 675 (1971), *City of Lynchburg* v. *Telephone Company*, 200 Va. 706, 107 S.E.2d 462 (1959), and *Norfolk* v. *Chesapeake etc., Tel. Co.*, 192 Va. 292, 64 S.E.2d 772 (1951). However, although evidence was presented showing rate base, both system-wide and jurisdictional, revenues and expenses, and earned and projected rate of return, the Commission did not err in making no specific findings relative thereto. No such findings are required in emergency proceedings under Code § 56-245.

The Commission did find, however, that Vepco's "ability to provide adequate and reliable electric service [was] in immediate jeopardy", and that the Company's current rate of return was insufficient to attract the necessary capital required to remedy the situation. Misconstruing our holding in the case, appellants rely on *Commonwealth* v. *VEPCO, supra*, as authority for the proposition that the Commission, in every rate case, must determine a fair return from jurisdictional customers only, rather than attempt to estimate the amount the company must earn to attract capital. We did hold that the Commission in a full scale rate case should determine a fair return from jurisdictional customers in relation to the cost of serving them. We did not, however, preclude a consideration of the amount the company must earn to attract capital as a significant factor in determining a fair rate of return on jurisdictional rate base. Indeed, we adhered to the principle that the "rate of return should be sufficient to enable the Company to attract the necessary capital to carry out its obligation to render service to the public." *Id.* at 769, 180 S.E.2d at 684. We merely disapproved the method of fixing rates, followed by one Commissioner, who, after having determined a fair rate of return (and thereby a fair return) on common equity, failed to relate this to jurisdictional rate base and cost of service.

In determining that additional annual revenues were necessary, the majority opinion stated that consideration was given to "the immediate expenditures for those construction projects nearing completion; deferred fuel cost; normalized accounting; return on investment; interest rates; debts due on outstanding bonds; this nation's struggle

for energy independence; and the plight of the customers in this era of double-digit inflation." The third member of the Commission concurred in the majority opinion, except that he was convinced that Vepco should be granted greater temporary rate relief than the amount fixed by the majority.

On the evidence presented in the emergency proceedings, we hold that the Commission was justified in allowing Vepco a temporary rate increase. In the proceedings on Vepco's application for permanent rate relief, all interested parties will have another opportunity to challenge the amount of the temporary rate increase. If the amount is found to have been too large, any excess will be refundable, with interest, to Virginia customers; if the amount is found to have been too small, the applicant will be entitled to additional relief.

The order of the Commission is

*Affirmed.*